Case 78.—A'CTION BY THOM'AS HA'CKETT AGAINST THE
BROOKISIVILLE GRA'DED SCHO'OL DISTRICT AND OTHERS
FOR AN INJUNCTION A'GAINST THE USE OF PRAYER'S
AND 'SONG'S ALLEGED TO BE SECTA'RIAN, AND THE
READING OF KING JAMES' TRANSLATION OF THE
BIBLE IN SAID SCHOOL.—May 31.

## Hackett v. Brooksville Graded School District, &c.

Appeal from Bracken Circuit Court.

JAMES P. HARBESON, Circuit Judge.

From a judgment of dismissal plaintiff appeals.
Affirmed.

Public ,Schools—Opening   With   Prayer—Sectarianism—Public
Worship—Objection by Parents—Bible—King James' Trans-
lation—Reading in School.

1. Public   Schools—Opening   With   Prayer—Sectarianism—The
Brooksville Graded School in this State is maintained by the
State by taxation.  It is open to all white children within
certain ages, who, or whose parents, reside in the district.
In opening this school every morning the following prayer
was offered: "Our Father, who art in Heaven, we ask Thy
aid in our day's work.  Be with us in all we do and say.  Give
us wisdom and strength and patience to teach these children
as they should be taught.  May teacher and pupil have mutual
love and respect.  Watch over these children both in the
schoolroom and on the playground.  Keep them from being
hurt in any way, and at last when we come to die may none
of our number be missing around Thy throne.  These things
we ask for Christ's sake.  Amen."  Held—That such prayer
is not "sectarian," either in form  or substance, within the mean-
ing of sec. 5 or sec. 189 of the Ky. Constitution, or of sec. 4368,
Ky. Stats.

2. Public Worship—Objection by Parents—Though it be conceded
that any prayer is worship, and that public prayer is public
worship, where children, whose parents object, are not re-
quired to attend at such prayer service, the school can not
be considered "a place of worship," nor are its teachers
"ministers of religion" within the contemplation of sec. 5

Hackett v. Brooksville Graded School District, &c.

of the Ky. Constitution, although a prayer may be offered incidentally at the opening of the school by the teacher.

3. Holy Bible—Reading in Schools—Sectarian Instruction—We believe the reason and weight of the authorities support the view that the King James' translation of the Bible is not a "sectarian" book within the meaning of the Ky. Stats., sec. 4368, which provides that "no books or other publications of a sectarian, infidel or immoral character shall be used or distributed in any common school, nor shall any sectarian, infidel or immoral doctrine be taught therein," and when used merely by reading in the common schools, without note or comment by teachers, is not sectarian instruction, nor does such use of the Bible make the schoolhouse a house of religious worship.

4. Same—Sectarian Book—That the Bible, or any particular edition, has been adopted by one or more denominations as authentic, or by them asserted to be inspired, can not make it a sectarian book. The book itself, to be sectarian, must show that it teaches the peculiar dogmas of a sect as such, and not alone that it is so comprehensive as to include them by the partial interpretation of its adherents. Nor is a book sectarian merely because it was edited or compiled by those of a particular sect. It is not the authorship, nor mechanical composition of the book, nor the use of it, but its contents that give it its character.

WM. A. BYRNE for appellant.

## STATEMENT.

Appellant, Thomas Hackett, a housekeeper in Brooksville, Bracken county, Ky., sends his children to the school of appellees, a common school maintained by the public under the common school laws of Kentucky. At this school appellant complains that appellees conduct religious exercises during school hours, with the children, consisting of prayers, denominational hymn singing, and reading of King James edition of the Bible.

1. The holding of these exercises, he claims, violates sec. 189 of the Constitution of Kentucky, which declares that "No portion of any fund or tax now existing, or that may hereafter be raised or levied for educational purposes, shall be appropriated to, or used by, or in aid of, any church, sectarian or denominational school."

2. He maintains, also, that the King James edition of the Bible is a sectarian book, and that its use in the schools in such manner is forbidden by sec. 4368, Ky. Stats.: "No books or other publica-

tions of a sectarian, infidel or immoral character, shall be used or distributed in any common school; nor shall any sectarian, infidel or immoral doctrine be taught therein." (Sec. 4368, Ky. Stats.)

3. It is his contention that his children are entitled to all the school time in said school without interruption by denominational or devotional exercises, and he asks simply, upon the proof presented and the admissions made by appellees, that this honorable court direct the court below to enjoin the further holding of such exercises in the school with the school children.

## APPELLEES' ADMISSION IN ANSWER.

Appellees in their answer admit that they open the exercises in the school by reading a portion of the Bible known as the King James Translation, and offering a prayer to the Deity.

The points for decision then, on the admitted facts, are:

1. Is it allowed to read the King James edition of the Bible to the pupils in a public school, in connection with prayers to God, during school hours?

2. Is it allowed to offer prayers to God during school hours in the public school?

3. Is the King James edition of the Bible a sectarian book?

The school of appellees is a part of the public school system of this State; is maintained by taxation upon all persons and property alike, of citizens of Kentucky, whether they are believers in any religion, or religious sect, or be non-believers, even infidels. To permit religious exercises in such a school, objectionable to citizens who desire their children to attend such a school, and who have a right to their attendance at such a school, is most certainly giving a preference to "a religious sect, society, or denomination, particular creed, mode of worship, or system of ecclesiastical polity."

## AUTHORITIES CITED.

Constitution of Kentucky, sec. 189; Ky. Stats., sec. 4368; Board of Trustees of Morganville School v. Thomas, 12 Ky. Law Rep., 832; State, ex rel Weise, &c. v. District Board of School District No. 80, City of Edgerton, 76 Wis., 177; Constitution of Wisconsin, sec. 3, art. 10; Laws of Wisconsin (1883), sec. 3, chap. 251; Constitution of Nebraska, sec. 4, art. 1; sec. 2, art. 8; State, ex rel Freeman v. Sheve, &c.(Neb.), 91 N. W., 846; Constitution of Ohio, sec. 7; sec. 2; Board of Education v. Minor, 33 O. S., 211; Pfeiffer v. Board of Education of Detroit, 118 Mich., 560; Constitution of Michigan, art. 4-41; art. 4-40; art. 4-39; Moore v. Monroe, 64 Iowa; Spiller v. Wilburn, 12 Allen (Mass.), 127; Donohue v.

Hackett v. Brooksville Graded School District, &c.

Richards, 38 Maine, 379; Constitution of Maine, art. 1, sec. 3; McCormick v. Burt, 95 Illinois, 263; Constitution of Illinois, art. 2, sec. 3; Vidal, &c. v. Girard's Ex'rs, 7 How., 125; Constitution of Kentucky, sec. 5; Bill of Rights of Kentucky, sub-sec. 2 of sec. 1; Kentucky Stats., sec. 2960; sec. 3217.

E. L. WORTHINGTON for appellees.

The two questions involved on this appeal are:

1. Does the offering of prayer to God in opening a school, such as was offered in the Brooksville school, make that school a "sectarian school," within the meaning of sec. 189 of the Constitution?

2. Is the King James translation of the Bible a "sectarian book," within the meaning of sec. 4368, Ky. Stats.?

The answer to those questions hinges entirely on the meaning of the word "sectarian," as used in our Constitution and Statutes. That is a question of constitutional and statutory construction simply, a question of law and not a question of fact to be proved or disproved by the opinion of witnesses. No man, be he priest, preacher or layman, is a competent witness to prove what the Constitutional Convention meant, or what the Legislature meant, by the use of the word "sectarian."

1. If there is such a thing as prayer to God which is not sectarian, then certainly the prayers with which the Brooksville school were opened were not sectarian.

The Constitutional Convention which adopted sec. 189 was opened with prayer every morning. Did that make it a "sectarian" Constitutional Convention? The two Houses of the Kentucky Legislature are opened with prayer every day. Does that make them a "sectarian" Senate, and a "sectarian" House of Representatives? Conventions to nominate candidates for President of the United States, and for Governors and other officers of the States, are usually opened with prayer. Does that make them "sectarian" conventions?

Obviously appellant is attaching a meaning to the word "sectarian," used in sec. 189 of the Constitution, very different from the one the convention which framed that Constitution attached to it, when he claims that the prayers offered in the Brooksville Public School made it a "sectarian" school.

No authority whatever supports the proposition that the saying of a prayer at the opening of any body of men or children makes that a "sectarian" body of people.

2. The question about which there is any room for dispute relates, not to the prayers offered, but to the book read in the Brooksville school. Is the King James translation of the Bible a "sectarian book," within the meaning of sec. 4368, Ky. Stats.?

The whole argument of appellant virtually concedes that if the King James translation is a sectarian book, then so is the Douay translation, and so is every other translation.

Much of appellant's argument is devoted to an endeavor to show that the King James translation differs, in some particulars, from the Douay translation. But the conclusion that counsel draws from that circumstance that either one or the other, or both, of these translations are sectarian, is a complete non sequitur. Even the original Greek copies of the Bible now in existence do not agree entirely. There are many verbal differences in the three oldest copies of the Greek Bible now known. Are each of those three old Greek manuscripts sectarian books, within the meaning of the Kentucky Constitution and Statutes?

Before the law can say that the King James translation, or any other translation, of the Bible is sectarian, the law must say, and the Legislature must have meant to say, that it teaches the soundness of the doctrines of some particular sect and the unsoundness of the contrary doctrines of all other sects. And then that particular sect will be the established Church of the State of Kentucky.

### AUTHORITIES CITED.

State v. Scheve, 59 L. R. A., 927; Vidal v. Girard's Ex'rs, 2 Howard, 200; State v. District Board, 20 Am. St. Rep., 41; Pfeiffer v. Board of Education of Detroit, 42 L. R. A., 536; Moore v. Monroe, 52 Am. St. Rep., 444; Donahue v. Richards, 61 Am. St. Dec., 256; County of Cook v. Industrial School, 8 Am. St. Rep., 415.

OPINION BY JUDGE O'REAR—Affirming.

Appellant, who resides in the town of Brooksville, and has children attending the Brooksville graded common school, brought this suit against the trustees and teachers of the school, seeking an injunction against the use of the English translation of the Bible, known as the "King James" or "authorized edition," and to prevent the teachers from opening the school with prayers or songs alleged to be of a denominational character. On full hearing the injunction was denied, and the petition dismissed.

To get at the exact question presented for decision on this appeal, we will eliminate the allegation con-

cerning worship of God by singing of sectarian songs. There was no proof whatever that any songs of any kind had been sung during the school year in which the suit was brought, nor was it either required or permitted. Whether it was permissible to have sung the songs complained. of is not, therefore, a matter considered by the court.

Appellant invokes sec. 189 of the Constitution of Kentucky and sec. 4368, Ky. Stats., 1903, which read as follows:

"No portion of any fund or tax now existing, or that may hereafter be raised or levied for educational purposes, shall be appropriated to, or used by, or in aid of any church, sectarian or denominational school." (Sec. 189, Constitution.)

"No books or other publications of a sectarian, infidel or immoral character, shall be used or distributed in any common school; nor shall any sectarian, infidel or immoral doctrine be taught therein." (Sec. 4368, Ky. Stats., 1903.)

The Brooksville graded common school is maintained by the State by the imposition of taxes. It is open alike to all white children within certain ages who or whose parents are residents of the district. It is in no sense a sectarian church or denominational school. Sec. 189 of the Constitution was aimed not to regulate the curriculum of the common schools of the State, but to prevent the appropriation .of public money to aid schools maintained by any church or sect of religionists. If the Constitution deals directly with the question of compulsory worship, it is in sec. 5, which reads as follows: "No preference shall ever be given by law to any religious sect, society or denomination; nor to any particular creed, mode of worship or system of ecclesiastical polity; nor shall any person be compelled to attend any place of wor-

ship, to contribute to the erection or maintenance of any such place, or to the salary or support of any minister of religion; nor shall any man be compelled to send his child to any school to which he may be conscientiously opposed; and the civil rights, privileges or capacities of no person shall be taken away, or in any wise diminished or enlarged, on account of his belief or disbelief of any religious tenet, dogma, or teaching. No human authority shall, in any case whatever, control or interfere with the rights of conscience." If, under the guise of public instruction, children should be required to attend schools where worship of God was compulsory, it would seem to be within the prohibition of that section. We find from the evidence in this case that, while chapters or passages from the Bible (King James translation) were read, and prayers were offered by the teachers at the opening of the school each morning, appellant's children, who are members of the Roman Catholic Church, were not required to attend during those exercises, nor were they or others who were conscienciously opposed to doing so required to participate in them.

Two questions are presented by the record for decision: (1) Does the offering of prayer to God in opening a school such as was offered in the Brooksville school, make that school a "sectarian school," within the meaning of section 189 of the Constitution? (2) Is the King James translation of the Bible a "sectarian book," within the meaning of section 4368, Ky. Stats.?

The prayer that was offered, and which it is urged converted the school into a sectarian school, is as follows: "Our Father who art in Heaven, we ask Thy aid in our day's work. Be with us in all we do and say. Give us wisdom and strength and patience to teach these children as they should be taught. May

teacher and pupil have mutual love and respect. Watch over these children, both in schoolroom and on the playground. Keep them from being hurt in any way, and at last, when we come to die, may none of our number be missing around Thy Throne. These things we ask for Christ's sake. Amen." It has not been pointed out to us wherein the prayer quoted is sectarian in its construction. The Reverend Father James A. Cusack, a witness for appellant, asseverates that, in his opinion, it is sectarian. But he admits that there is nothing in it repugnant to the doctrines of his religious belief (Roman Catholic). Nor does he claim that it is promulgated, authorized, or used by any sect of religionists whatever. As neither the form nor substance of the prayer complained of seem to represent any peculiar view or dogma of any sect or denomination, or to teach them, or to detract from those of any other, it is not sectarian, in the sense that the word is commonly used and understood, and as it was evidently intended in the section quoted. The constitutional convention, in framing the organic law for all the people of the State, must be presumed to have used ordinary words, not according to the peculiar views of a few, but as generally used. The word "sectarian," from the connection in which it is used, cannot be given the construction contended for by appellant, which seems to be that any form of prayer not authorized by a particular church is sectarian.

Though it be conceded that any prayer is worship, and that public prayer is public worship, still appellant's children were not compelled to attend the place where the worshiping was done during the prayer. The school was not "a place of worship," nor are its teachers "ministers of religion," within the contemplation of sec. 5 of the Constitution, although a prayer may be offered incidentally at the opening of

the school by a teacher.   Meetings of the General As-
sembly are opened by prayer, and other State institu-
tions authorize the worship of God.   They have never
been regarded as fostering sectarian teachings.   The
complaint in this case goes only   to   the   sectarian
feature of the exercises, not because they were re-
ligious.   It is not contended that it was the purpose of
the Constitution to prevent worship, nor to prevent
teachers in the public schools from assuming worship-
ful relations.   The great aim was to keep church and
State forever separate as distinct institutions; to pre-
vent the government of one form assuming rightful
control of the government of the other.   Nor is it
clear that it was intended to keep religion out of the
school, though it is apparent that one aim, at least,
was to keep the "church" out.   The question is not
presented, and is not, therefore, decided, whether any
exercise which partakes incidentally of worship is
prohibited.

The main question, we conceive to be, is the King
James translation of the Bible, or, for that matter,
any edition of the Bible, a sectarian book?   There is,
perhaps, no book that is so widely used and so highly
respected as the Bible; no other that has been trans-
lated into as many tongues; no other that has had
such marked influence upon the habits and life of the
world.   It is not the least of its marvelous attributes
that it is so catholic that every seeming phase of be-
lief finds comfort in its   comprehensive   precepts.
Many translations of it, and of parts of it, have been
made from time to time, since two or three centuries
before the beginning of the Christian era.   And since
the discovery of the art of printing and the manu-
facture of paper in the sixteenth century, a great many
editions of it have been printed.   There is controversy
over the authenticity of some parts of some of the

editions.   And there are some people who do not be-
lieve that any of it is the inspired or revealed word of
God.   Yet it remains that civilized mankind generally
accord to it a reverential regard, while all who study
its sublime sentiments and consider its great moral
influence must admit that it is, from any point of
view, one of the most important of books.   That it
has drawn to its careful study and research into its
history and translations so many profound scholars
of history, is not to be wondered at.   The result has
been that, while many editions of the several transla-
tions have been made, those based upon the revision
compiled under the reign of King James I, 1607-
1611, and very generally used by Protestants, and the
one compiled at Douay some time previous, and which
was later adopted by the Roman Catholic Church as
the only authentic version, are the most commonly
used in this country. That the Bible, or any particular
edition, has been adopted by one or more denomina-
tions as authentic, or by them asserted to be inspired,
cannot make it a sectarian book.   The book itself,
to be sectarian, must show that it teaches the peculiar
dogmas of a sect as such, and not alone that it is so
comprehensive as to include them by the partial in-
terpretation of its adherents.  . Nor is a book sectarian
merely because it was edited or compiled by those of a
particular sect.   It is not the authorship nor mechan-
ical composition of the book, nor the use of it, but its
contents, that give   it   its   character.   Appellant's
view seems to be that the church is the custodian and
interpreter of the Bible as God's word.   From that
it is supposed that any Bible not put forth by author-
ity of a church claiming that prerogative is sectarian.
The question is not whether  the   version   used   is
canonical or apocryphal.   That question does not at
all enter into the matter.   Otherwise it would inev-

itably lead to the state that any book not favored by some church authority, or which may be supposed by it to be hostile to its teachings, would be sectarian. In that way the authority of a church could largely control the course of study in the public schools by issuing its bull against certain scientific or moral treatises as being atheistic or heretic. The very mischief aimed at by the framers of the Constitution, and by the people adopting it, would thus be accomplished, viz., the interference in matters of State by the church.

If the Legislature or the constitutional convention had intended that the Bible should be proscribed, they would simply have said so. The word "Bible" is shorter and better understood than the word "sectarian." It is not conceivable that, if it had been intended to exclude the Bible from public schools, that purpose would have been obscured within a controversial word. Nor can we conceive that under the American system of providing thorough education of all the youth, to fit them for good citizenship in every sense, the Legislature or the constitutional convention could have intended to exclude from their course of instruction any consideration of such a work, whose historical and literary value, aside from its theological aspects, would seem to entitle it to a high place in any well-ordered course of general instruction. The history of a religion, including its teachings and claim of authority—as, for example, the writings of Confucius or Mahomet—might be profitably studied. Why may not also the wisdom of Solomon and the life of Christ? If the same things were in any other book than the Bible, it would not be doubted that it was within the discretion of the school boards and teachers whether it was expedient to include them in the common school course of study without violating the impartiality of the law concerning

Hackett v. Brooksville Graded School District, &c.

religious beliefs. The objection does not appear to be to the matter. It is to the publication.

A learned witness for appellant, who gives it as a matter of religious belief and teaching, says that the church is the interpreter of the Bible, but that the Protestants teach on the contrary that every one is his own interpreter. The Constitution may be said to teach, too, that every one is his own interpreter, for it guarantees that every one may worship God (which is supposed to include the study of His revealed word) according to the dictates of his own conscience. Children are taught the Constitution in the common schools. May it not be said then with equal force that to teach the Constitution, which itself teaches the right of perfect freedom in the worship of God, is sectarian, because some sect might deny that it was right to teach the children to worship God in any way except according to the teachings of that particular sect? Milton, Newton, Galileo, as well as Wickliffe, Whittingham, and Tyndale, came under the bans of the church. The philosophy and the writings of these great thinkers, wherein they do not teach sectarianism, may be used in the public schools, and in some part are so used, in spite of the fact that at one time they were believed to be hostile to God's revelations as interpreted by the church. This same question, in one form or another, has come before the courts of the country a number of times. It has not been so free from doubt that the conclusions of the judges have always been harmonious. This has been in part owing to the differing expressions of the Constitutions and statutes being interpreted. While allowing that because of these differences in language the opinions may not appear to be precisely in point, yet they reflect the drift of judicial opinion in this country, so far as it has been expressed, concerning

the main idea—whether the Bible is a sectarian book.
Likewise whether it may be read in the public schools
at all. While some of the Constitutions construed
in terms prohibit the use of sectarian books in the
public schools, yet, independent of those provisions,
it seems to be generally conceded that to teach
sectarianism in a public school would be violative of
religious freedom, which is guaranteed by every Con-
stitution. With this explanation we will briefly re-
view the decisions bearing on the subject.

One of the earliest cases, celebrated for the great
learning displayed, as well as by the distinguished
ability of the judge, who wrote the opinion, is Vidal
v. Girard's Ex'r, 2 How. (U. S.), 127, 11 L. Ed., 205,
opinion by Mr. Justice Story. The question for deci-
sion, so far as it bears on this case, was whether a
charitable bequest of the late Stephen Girard, es-
tablishing a college, prohibited the teaching of
Christianity to its pupils. The will contained this
restrictive clause: ''I enjoin and require that no ec-
clesiastic, missionary, or minister of any sect what-
ever, shall ever hold or exercise any station or duty
whatever in said college; nor shall any such person
ever be admitted for any purpose, or as a visitor,
within the premises appropriated to the purposes of
the said college.'' The intention of the testator, so
far as it was not unlawful, was as the law of the case.
The question was, did he intend to exclude the teach-
ings of Christianity, or its being taught by the clergy?
The testator himself furnished this key to his thought
(page 133 of 2 How., 11 L. Ed., 205): ''In making
this restriction, I do not mean to cast any reflection
upon any sect or person whatsoever; but as there
is such a multitude of sects, and such a diversity of
opinion amongst them, I desire to keep the tender
minds of the orphans, who are to derive ad-

vantage from this bequest, free from the excitement which clashing doctrines and sectarian controversy are so apt to produce; my desire is that all the instructors and teachers in the college shall take pains to instill into the minds of the scholars the purest principles of morality, so that, in their entrance into active life, they may, from inclination and habit, evince benevolence toward their fellow-creatures, and a love of truth, sobriety and industry, adopting at the same time such religious tenets as their matured reason may enable them to prefer.''

It would be difficult to express a more fitting description of the underlying principles of our government in its treatment of the subject of public education. In construing those provisions of the will which we have quoted as bearing particularly on the subject whether the Bible and its teachings might be employed in the college by lay teachers, the court said: ''Why may not the Bible, and especially the New Testament, without note or comment, be read and taught as a divine revelation in the college; its general precepts expounded, its evidences explained, and its glorious principles of morality inculcated? What is there to prevent a work, not sectarian upon the general evidences of Christianity, from being read and taught in the college by lay teachers? Certainly there is nothing in the will that proscribes such studies. Above all, the testator positively enjoins 'that all the instructors and teachers in the college shall take pains to instill into the minds of the scholars the purest principles of morality, so that, on their entrance into active life, they may, from inclination and habit, evince benevolence towards their fellow-creatures, and a love of truth, sobriety, and industry, adopting at the same time such religious tenets as their matured reason may enable them to

prefer.' Now, it may well be asked, what is there in all this, which is positively enjoined, inconsistent with the spirit or truths of Christianity? Are not these truths all taught by Christianity, although it teaches much more? Where can the purest principles of morality be learned so clearly or so perfectly as from the New Testament? Where are benevolence, the love of truth, sobriety, and industry, so powerfully and irresistibly inculcated as in the sacred volume? The testator has not said how these great principles are to be taught, or by whom, except it be by laymen, nor what books are to be used to explain or enforce them. All that we can gather from his language is that he desired to exclude sectarians and sectarianism from the college, leaving the instructors and officers free to teach the purest morality, the love of truth, sobriety, and industry, by all appropriate means; and, of course, including the best, the surest and the most impressive.'' Two points are emphasized by the reasoning of the learned judge: (1) That it was sectarianism that was prohibited, and (2) that the Bible is not a sectarian book—which are the two points most prominent in this case.

Donahoe v. Richards, 38 Me., 379, 61 Am. Dec., 256, was an action against a school board for expelling a pupil who refused to read the English version of the Bible, that book having been adopted by the board as one to be used by the pupils in the course of the school work. We note that counsel for appellee contends that this case ought not to be regarded as authority, because there was neither statute nor constitutional prohibition on the subject of sectarian teaching. Yet the court held that: ''The common schools are not for the purpose of instruction in the theological doctrines of any religion or of any sect. The State regards no sect as superior to any other, * * *

and, if the tenet of any particular sect were so taught, it would furnish a well-grounded cause of complaint on the part of those who entertained different or opposing religious sentiments." The court held that the King James translation of the Bible was not a sectarian book. It was said: "The Bible was used merely as a book in which instruction in reading was given. But reading the Bible is no more an interference with religious belief than would reading the mythology of Greece or Rome be regarded as interfering with religious belief or an affirmance of the pagan creeds."

In Spiller v. Inhabitants of Woburn, 12 Allen (Mass.), 127, it was held that the public school committee did not exceed their authority in passing an order that the Bible should be read at the opening of the schools on the morning of each day. "No more appropriate method could be adopted," said the court, "of keeping in mind of both teachers and scholars that one of the chief objects of education, as declared by the statutes of this Commonwealth, and which teachers are especially enjoined to carry into effect, is to impress on the minds of children and youth committed to their care and instruction the principles of piety and justice, and a sacred regard for truth."

It is not deemed necessary in this State to define by statute now the purposes of public education. They are at least as broad as the broadest under any similar system in use in any of the States.

Pfeiffer v. Board of Education of District, 118 Mich., 560, 77 N. W., 250, 42 L. R. A., 536, was an application to the court to compel the board of education to discontinue the use of a certain book known as "Readings from the Bible" in the public schools of Detroit. The Constitution and laws of Michigan

on the subject of religious freedom are substantially as are ours, save there was no express inhibition of sectarian instruction in public schools. The question decided by the court was that Readings from the Bible, though it was used as a text-book in the school, did not violate constitutional provisions guarantying to every one the right to worship Almighty God according to the dictates of his own conscience; nor was it a compulsion of any person to attend or support any place of religious worship, or to pay taxes to any minister of the gospel or teacher of religion; nor was it an appropriation of the public money for the benefit of any religious sect or society; nor was it a diminution of the civil rights of any person on account of his religious belief. One judge dissented from the opinion of the court.

In Moore v. Monroe, 64 Iowa, 367, 20 N. W., 475, 52 Am. Rep., 444, it was shown that the teachers of the school were accustomed to occupy a few minutes each morning in reading selections from the Bible, in repeating the Lord's prayer, and singing religious songs. The plaintiff had two children in the school, but they were not required to be present during the time thus occupied. A statute of that State provided: "The Bible shall not be excluded from any school or institution in this State, nor shall any pupil be required to read it contrary to the wishes of his parent or guardian." The Constitution of the State prohibited the Legislature from passing any law interfering with the free exercise of religious worship, or compelling any person to pay taxes to support any religion, or for building any place of worship, or the maintenance of any ministry. The plaintiff's contention was that by the use of the schoolhouse as a place for reading the Bible, repeating the Lord's prayer, and singing religious songs it

was made a place of worship; that his children were compelled to attend a place of worship, and he as a taxpayer was compelled to aid in building and repairing a place of worship. The court held that the statute did not have any of the effects claimed by the plaintiff. In the absence of such a statute, a rule of the school board to the same effect could not, of course, violate the same constitutional principles, if the statute would not have done so.

The Supreme Court of Illinois, in McCormick v. Burt, 95 Ill., 263, 35 Am. Rep., 163, held that a rule of the directors of a public school requiring the reading of a King James edition of the Bible for 15 minutes each morning, at which, however, no one was required to be present or to participate in, was not unconstitutional as interfering with the religious conviction of the plaintiff and his father, who were patrons of the school, and Roman Catholics.

In none of the States from which the foregoing opinions have been cited was there an express prohibition of the use of sectarian books. Still in all of them there was the familiar and fundamental constitutional provision guarantying religious freedom, which would have been violated, as was held in every instance, either in terms or by necessary implication, by the teaching of sectarian doctrines. That such would have been the result of such teaching seems to us to be perfectly obvious. In the very learned and exhaustive note by Judge Freeman to County of Cook v. Industrial School, 8 Am. St. Rep., 386 (case reported in 125 Ill., 540, 18 N. E., 183, 1 L. R. A., 437), it is shown that the Constitutions of 24 States contain provisions prohibiting the payment of moneys or any appropriation or grant for the support, benefit or in aid of sectarian schools. The editor, comment-

ing on the constitutional provisions mentioned, and others where they are silent upon the matter of sectarianism, says: "In view of the above decisions and constitutional provisions, we conclude that the words used in the several Constitutions in point, where the language does not expressly so indicate, must have been intended by the people who ratified them to provide against the promulgation or teaching of the distinctive doctrines, creeds, or tenets of any particular Christian or other religious sect in schools or institutions where such instruction was to be paid for out of the public funds, or aided by such funds or by public grants, and that a school or institution is sectarian when the doctrines or tenets of some particular faith, sect, or religion are taught to the exclusion of others; and especially so where a school or institution has a distinctive or strict denominational name descriptive or indicative of the fundamental doctrines of the sect to which it belongs; or where a school or institution is under the exclusive control of a sect having such name, and by a course of instruction excluding all others, seeks to inculcate its tenets alone, it is then sectarian; and it makes no difference that pupils of all sects, denominations, and religious beliefs, or those of no belief, are permitted the advantages of such school or institution. It is what is taught that is the determining factor."

This brings us to the consideration of the authorities relied on by appellant.

State v. District Board of School District No. 8 of the City of Edgerton, 76 Wis., 177, 44 N. W., 967, 7 L. R. A., 330, 20 Am. St. Rep., 41, is the principal case cited. The questions there presented were whether the reading of selected portions of the King James translation of the Bible during school hours violated the rights of conscience, compelled complainants to

aid in support of a place of religious worship, and was sectarian instruction. All three propositions were decided in the affirmative. The decision is apparently against the weight of authority. The court seemed to realize as much, if they should be regarded as all bearing on the same principle. Speaking of them, but not discussing them in detail, the court said: ''A number of cases in different States, supposed to have a bearing upon the main question here considered and determined (to-wit, whether the King James version of the Bible is a sectarian book), have been cited, and quotations made therefrom at considerable length by the respective counsel and by the circuit judge overruling the demurrer to the answer. None of the States in which those decisions were made seem to have in their Constitution a direct prohibition of sectarian instruction in the public schools. It is believed that this State was the first which expressly embodied the prohibition in its fundamental law, and we are not aware of any direct adjudication of the question under consideration.''

The court seems to turn the case upon the fact that the King James version, ''the whole of it,'' was used as a reading book in the school. The opinion admits that text-books founded upon or containing extracts from the Bible might be properly used. It was even said: ''The constitutional prohibition of sectarian instruction does not include them, even though they may contain passages from which some inferences of sectarian doctrine might possibly be drawn. Furthermore, there is much in the Bible which can not justly be characterized as sectarian. There can be no valid objection to the use of such matter in the secular instruction of the pupils. Much of it has great historical and literary value, which may be thus utilized without violating the constitutional prohibition. It

may also be used to inculcate good morals—that is,
our duty to each other—which may and ought to be in
culcated by the district schools. No more complete
code of morals exists than is contained in the New
Testament, which re-affirms and emphasizes the moral
obligations laid down in the Ten Commandments.''
With profound respect to the Supreme Court of
Wisconsin, we are nevertheless unable to see how its
position can be maintained logically. For it takes no
notice of the conscientious conviction of the Jews, or
non-believers, any of whom may have as valid objec-
tion to the use of any part of the New Testament as
Roman Catholic citizens have to the King James
version. It seems to narrow the question down to
matter of canonical approval of the printed volumes.
The court does not attempt to argue, nor do we see
how it could be maintained, that that fact alone could
make a book sectarian which in its matter was not
inherently so.

The next case is State of Nebraska ex rel. Freeman
v. Schere, 91 N. W., 846, 93 N. W., 169, 59 L. R. A.,
927. The Constitution of Nebraska provides: ''No
sectarian instruction shall be allowed in any school or
institution supported in whole or in part, by the pub-
lic funds set apart for educational purposes.'' The
action complained of was the reading of selections
and extracts from the ''King James version or trans-
lation of the Bible,'' and the singing of certain re-
ligious and sectarian songs, and the offering of
prayer to the Deity. The court said: ''We do not
think it wise or necessary to prolong a discussion of
what appears to us an almost self-evident fact—that
exercises such as are complained of by the relator in
this case both constitute religious worship and are
sectarian in their character, within the meaning of the
Constitution. Nor do we feel inclined to make what

might be looked upon as a spurious exhibition of learning by quoting at length from the many judicial decisions and utterances of eminent men in this country concerning the subject. Perhaps the case most nearly in point, because of similarity both of facts involved and constitutional enactments construed to the case at bar, is State ex rel. Weiss v. District Board, 76 Wis., 177, 44 N. W., 967, 7 L. R. A., 330, 20 Am. St. Rep., 41.''

It is undeniably the peculiar province of the Supreme Courts of the States to place final authoritative construction upon the Constitutions of their respective States in matters involving solely their internal policy. Whether the reasons given by the court are sound or not, is not material as affecting the binding force of the construction upon citizens and others whose actions come up for consideration by the government of that State. But where the opinion is cited abroad as persuasive argument why its conclusions should be elsewhere adopted, it is of the first importance that its reasoning should be sound. That similar provisions, or the same principle of law, have frequently come before other high courts of last resort, and been by them decided in a certain way, is a fact that can not safely be ignored. It is more than likely that a general concurrence of judicial opinion on the same subject is apt to be right. Due deference to the enlightened judgment of the learned profession of the law, and to all concerned, leave no alternative but to consider all that has been said by courts of equal rank upon a subject of such universal importance as to have been incorporated in some form in every Constitution of the States of America. Two of the judges of the Supreme Court of Nebraska confined their concurrence to the point of ''sectarian instruction.'' On petition for rehearing the chief justice

filed a response on behalf of the court. The only case admitted to have a direct bearing on the question opposing the court's conclusions was the Michigan case cited above. But we observe what appears to us to be a modification of the original opinion in parts of the response. After pointing out that there are admittedly verbal differences between the King James and the Douay translations of the Bible, which some sectarians regard as material, the court said: "But the fact that the King James translations may be used to inculcate sectarian doctrines affords no presumption that it will be so used. The law does not forbid the use of the Bible in either version in the public schools. It is not proscribed either by the Constitution or the statutes, and the courts have no right to declare its use to be unlawful because it is possible or probable that those who are privileged to use it will misuse the privilege by attempting to propagate their own peculiar theological or ecclesiastical views and opinions. The point where the courts may rightfully intervene, and where they should intervene without hesitation, is where legitimate use has degenerated into abuse—where a teacher employed to give secular instruction has violated the Constitution by becoming a sectarian propagandist. * * * The section of the Constitution which provides that 'no sectarian instruction shall be allowed in any school or institution supported, in whole or in part, by the public funds set apart for educational purposes,' can not, under any canon of construction with which we are acquainted, be held to mean that neither the Bible nor any part of it, from Genesis to Revelation, may be read in the educational institutions fostered by the State."

The court also wisely noted that sectarian instruction might occur from frequent reading, even without

note or comment, of "judiciously selected passages," and observed that whether such practices existed as amounted to sectarian instruction must be determined upon the facts of each particular case.   We find our-selves in entire accord with the views quoted above from the response of the Nebraska Supreme Court.

In Board of Education v. Minor, 23 Ohio St., 211, 13 Am. Rep., 233, the only question presented or de-cided was whether the school board might not pro-hibit the reading of the Bible in the public schools. It was held that they could; that nothing in the laws of that State made it compulsory upon the boards or teachers to use the Bible as a text-book.

We believe the reason and weight of the authori-ties support the view that the Bible is not of itself a sectarian book, and, when used merely for reading in the common schools, without note or comment by teachers, is not sectarian instruction; nor does such use of the Bible make the schoolhouse a house of re-ligious worship.

The judgment of the circuit judge, having been in accord herewith, is affirmed.

JUDGE CANTRILL, absent.

Petition for rehearing by appellant overruled.