## Religious Education

PHILLIPS, Deputy Attorney General, July 23, 1948.—You have requested our advice on a number of specific questions regarding religious education in the public school system of Pennsylvania in view of the decision of the United States Supreme Court in the case of People of State of Illinois ex rel. McCollum v. Board of Education of School Dist. No. 71, Champaign County, Ill., et al., decided March 8, 1948, 333 U. S. 203, 68 Sup. Ct. 461, 92 L. Ed. 451, hereinafter referred to as the Champaign case.

The facts in the Champaign case may be stated briefly as follows:

The school directors of the Champaign District had participated in a voluntary program with interested

members of the Jewish, Roman Catholic and Protestant faiths, by which religious teachers, employed by private religious groups, were permitted to come weekly into the school buildings during the regular hours set apart for sectarian teaching, and then, and there, for a period of 30 minutes substituted their religious teaching for the secular education provided under the compulsory education law of Illinois. This program was not expressly authorized by statute. It was entirely voluntary. Students who did not choose to take the religious instruction were not released from public school duties. They were required to leave their classrooms and to go to some other place in the school building for the pursuit of their secular studies. Attendance at religious classes was required of pupils only with the consent of their parents. Petitioner charged that this program violated the first and fourteenth amendments to the United States Constitution, and the charge was sustained by the court.

In condemning this practice, the opinion of the court states (333 U. S. 209-211) :

"The foregoing facts, without reference to others that appear in the record, show the use of tax-supported property for religious instruction and the close coöperation between the school authorities and the religious council in promoting religious education. The operation of the state's compulsory education system thus assists and is integrated with the program of religious instruction carried on by separate religious sects. Pupils compelled by law to go to school for secular education are released in part from their legal duty upon the condition that they attend the religious classes. This is beyond all question a utilization of the tax-established and tax-supported public school system to aid religious groups to spread their faith. And it falls squarely under the ban of the First Amendment (made applicable to the States by the Fourteenth) as we interpreted it in *Everson v. Board*

*of Education,* 330 U. S. 1. There we said: 'Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force or influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or for professing religious beliefs or disbeliefs, for church attendance or nonattendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa. . . ."

Turning now to the Constitution of our State, we find that it includes several provisions which are relevant. Article I, sec. 3, provides:

"All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience and no preference shall ever be given by law to any religious establishments or modes of worship."

Article X provides for the establishment and maintenance of a public school system within the Commonwealth, and section 2 thereof provides:

"No money raised for the support of the public schools of the Commonwealth shall be appropriated to or used for the support of any sectarian school."

This prohibition against the use of public funds for sectarian religious purposes also appears in article III, sec. 18, which provides:

"No appropriations, . . . shall be made for charitable, educational or benevolent purposes, to any per-

son or community, nor to any denominational or sectarian institution, corporation or association."

We answer the questions in the order presented:

## I.

I. May religious instruction be given to public school pupils in public school buildings at a time when the public schools are in regular session?

The facts of the Champaign case squarely presented the situation in which religious instruction was given to public school pupils in public school buildings at a time when such schools were in regular session.

The decision of the Supreme Court, in the excerpt quoted above from the opinion, ruled directly that such practice involved "the use of tax-supported property for religious instruction" and was in violation of the fourteenth amendment to the Constitution of the United States.

Amendment 1 provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . ."

This provision, as interpreted by the Supreme Court of the United States, is the supreme law of the land and is binding upon the courts and the people of this Commonwealth.

We are, therefore, of the opinion that the practice suggested in question I would be in violation of the first amendment to the Federal Constitution and question I must be answered in the negative.

## II.

II. May public school buildings be used for religious instruction or religious services by anyone or groups of individuals, including public school pupils, when the schools are not in session?

In Hysong et al. v. Gallitzin Borough School District et al., 164 Pa. 629 (1894), the lower court upon a bill in equity filed by taxpayers enjoined the school district from permitting the school rooms to be used

*after school hours* by teachers in imparting Catholic religious instruction.

On appeal, the Supreme Court of Pennsylvania expressed itself in full accord with the following portion of the opinion of the court below:

" 'The use of the public school building in imparting religious instruction after school hours, in the manner detailed by us in our conclusions of fact, is not only a violation of the fundamental law of the state in that the instruction, being purely and essentially sectarian in its character, is prohibited, but the directors exceeded their authority in permitting any such use to be made of the building. It is very clear to us that the prohibition of the appropriation of money raised for the support of public schools to sectarian schools includes the use of the public school buildings, erected by such money, for any sectarian purpose. But there is a further reason for restraining the use of the public school building for this purpose, as well as for any other purpose foreign to public school instruction; and that is that, the building having been erected for a particular corporate purpose, the corporate authorities cannot authorize its use for any other, and any diversion is illegal, and must be restrained when complained of. . . .' " (649)

In Bender v. Streabich, 182 Pa. 251 (1897), the Supreme Court of Pennsylvania held broadly that the school directors had no authority to permit public school buildings to be used for sectarian religious instruction or for other than school purposes.

In the opinion, Mr. Justice Fell said:

". . . This question, in so far as it relates to their use for religious meetings, is fully answered by the decision in *Hysong* v. *School District of Gallitzin Borough*, 164 Pa. 629. . . ." (252-253) (Italics ours)

These decisions were modified in part by section 627 of the Act of May 18, 1911, P. L. 309, as amended, known as the School Code, 24 PS §773, which permits the use of school buildings for certain purposes:

"The board of school directors of any district may permit the use of its school grounds and buildings for social, recreation, and other proper purposes, under such rules and regulations as the board may adopt, and shall make such arrangements with any city, borough, or township authorities for the improvement, care, protection, and maintenance of school buildings and grounds for school, park, play, or other recreation purposes, as it may see proper, and any board of school directors may make such arrangements as it may see proper with any officials or individuals for the temporary use of school property for schools, playgrounds, social, recreation, or other proper educational purposes, primaries and elections. . . ."

The words "park, play, or other recreation purposes", and "playgrounds, social, recreation, or other proper educational purposes, primaries and elections" are specific and in our opinion would not include "religious" purposes.

In view of the repeated rulings of the Supreme Court of Pennsylvania, that public school buildings may not be used after school hours for religious purposes, we believe that if the legislature had intended to permit such use it would have included the word "religious" in the statutory language just quoted, and that the words "other proper purposes" and "other proper educational purposes" were advisedly used to conform with those rulings.

Questions III to VI were not raised by the facts of the Champaign case nor decided by the court.

Four separate opinions were filed in which the opinions of the justices were independently asserted.

While the language of the several opinions might throw some light upon questions III to VI, propounded by you, it is our judgment that none of them was presented to or actually decided by the Supreme Court of the United States. Any attempt of ours to apply the language of the justices to these questions would

only amount to "a forecast, rather than a determination": Spector Motor Co. v. McLaughlin, 323 U. S. 101, 104 (1944).

In the Champaign case, Mr. Justice Jackson said (p. 237):

"The opinions in this case show that public educational authorities have evolved a considerable variety of practices in dealing with the religious problem. Neighborhoods differ in racial, religious and cultural compositions. It must be expected that they will adopt different customs which will give emphasis to different values and will induce different experiments. And it must be expected that, no matter what practice prevails, there will be many discontented and possibly belligerent minorities. We must leave some flexibility to meet local conditions, some chance to progress by trial and error. While I agree that the religious classes involved here go beyond permissible limits, I also think the complaint demands more than plaintiff is entitled to have granted. So far as I can see this Court does not tell the State court where it may stop, nor does it set up any standards by which the State court may determine that question for itself."

It is therefore, our opinion that questions III to VI should be determined by the law of Pennsylvania until and unless the Supreme Court of the United States, in interpreting amendment 1 to the Federal Constitution, decides differently.

### III.

III. What effect, if any, does the Champaign case have on the Act of May 20, 1913, P. L. 226?

The Act of May 20, 1913, P. L. 226 provides:

"Whereas, It is in the interest of good moral training, of a life of honorable thought and of good citizenship, that the public school children should have lessons of morality brought to their attention during their school-days; therefore, be it resolved,—

"Section 1. Be it enacted &c., That at least ten verses from the Holy Bible shall be read, or caused to be read, without comment, at the opening of each and every public school, upon each and every school-day, by the teacher in charge: . . ." (24 PS § 1555).

This statute was enacted by the legislature in the interest of good moral training and of good citizenship, to bring to the attention of public school children the fundamental lessons of morality.

The government of the Commonwealth, and its legal system, is based on the moral precepts of Christianity. This premise received early recognition in Commonwealth v. Wolf, 3 S. & R. 48, 51 (1817), wherein the court said:

"Laws cannot be administered in any civilised government unless the people are taught to revere the sancity of an oath, and look to a future state of rewards and punishments for the deeds of this life. . . ."

Also, in Updegraph v. The Commonwealth, 11 S. & R. 394 (1824), it was held in an elaborate opinion that Christianity is part of the common law of Pennsylvania. The Supreme Court of Pennsylvania said on page 400:

"Christianity, general Christianity, is, and always has been, a part of the common law of Pennsylvania; Christianity, without the spiritual artillery of European countries; for this Christianity was one of the considerations of the royal charter, and the very basis of its great founder, William Penn; not Christianity founded on any particular religious tenets; not Christianity with an established church, and tithes, and spiritual courts; but Christianity with liberty of conscience to all men. . . ."

Based on this decision, Justice Story in Vidal v. Girard's Executors, 2 How. 127, 200, 11 L. ed. 205 (1844), in discussing the famous provision in Girard's will excluding ecclesiastics, and by implication, instruc-

tion in the Christian religion, from the college therein created, asks:

". . . Why may not the Bible, and especially the New Testament, without note or comment, be read and taught as a divine revelation in the college—its general precepts expounded, its evidences explained, and its glorious principles of morality inculcated? What is there to prevent a work, not sectarian, upon the general evidences of Christianity, from being read and taught in the college by lay teachers? . . ."

Girard's declared intention was to prevent children of tender years from being exposed to sectarian religious disputes.

Justice Story's questions have not come before the appellate courts of the State. They have been, however, the subject of several lower court cases. In Hart v. School District of Sharpsville, 2 Lanc. Rev. 346 (1885), (C. P. Mercer), plaintiffs complained that the defendant school directors had authorized the reading of King James version of the Bible and the singing of Protestant gospel hymns in the public schools. No comment was made upon the Bible, and Catholic children were permitted the use of a separate room during this exercise. The court dismissed the bill, but observed that our theory of law is based on Christian principles; that public schools must educate for the public good; that the morality of the State is based on the Bible and that the King James version was *not proved* to be a sectarian version within the meaning of article X, sec. 2, of the Constitution, citing Vidal v. Girard's Executors, supra.

A similar question arose in Stevenson v. Hanyon et al., 7 Dist. R. 585 (1898), (C. P. Lackawanna), wherein it was complained that the principal of the public school conducted religious exercises during school hours in the Methodist Episcopal form and read from the King James version of the Bible. The bill was dismissed on the grounds that the King James

version is not a sectarian book. Also, in Curran v. White et al., 22 Pa. C. C. 201 (C. P. Wayne, 1898), there are dicta to the effect that Bible reading as part of the opening exercise of the public schools is not in contravention of our Constitution.

The question whether the Bible or the King James version of the Bible is a sectarian book has been the subject of numerous cases in other jurisdictions. It has been held that the mere reading of selections from the King James version in public schools without comment does not violate any of the constitutional prohibitions against sectarianism or interference with religious freedom.[1] Some courts have gone farther, permitting not only Bible reading but also the singing of hymns, the recital of prayers, the recital of the Ten Commandments, or psalms.[2]

It has also been held in other States that resolutions of the public school authorities requiring or permitting the Bible to be read in the schools is not necessarily a violation of any constitutional provision if done merely

---

[1] People ex rel. Vollmar v. Stanley et al., 81 Colo. 276, 255 Pac. 610 (1927); Kaplan v. Independent School Dist. of Virginia et al., 171 Minn. 142, 214 N. W. 18 (1927); Lewis v. Board of Education of City of New York, 157 Misc. 520, 285 N. Y. S. 164 (1935); app. dis., 276 N. Y. 490, 12 N. E. (2) 172 (1935); Hackett v. Brooksville Graded School Dist. et al., 120 Ky. 608, 87 S. W. 792 (1905); Donahoe, prochein ami v. Richards, & als., 38 Me. 379 (1854); State ex rel. Freeman v. Scheve et al., 65 Neb. 853, 91 N. W. 846 (1902); Moore v. Monroe and another, 64 Iowa 367, 20 N. W. 475 (1884); semble, Evans v. Selma Union High School Dist. of Fresno County et al., 193 Cal. 54, 222 Pac. 801 (1924) (King James version is non-sectarian).

[2] Pfeiffer v. Board of Education of City of Detroit, 118 Mich. 560, 77 N. W. 250 (1898); Com. ex rel. Wall v. Cooke, 7 Am. L. Reg. (Mass.) 417 (1859); Moore v. Monroe and another, 64 Iowa 367, 20 N. W. 475 (1884); North v. Board of Trustees of University of Illinois, 137 Ill. 296, 27 N. E. 54 (1891); Hackett v. Brooksville Graded School Dist. et al., 120 Ky. 608, 87 S. W. 792 (1905); Wilkerson et al. v. City of Rome et al., 152 Ga. 762, 110 S. E. 895 (1922).

for the purpose of inculcating morality, and not for the purpose of sectarian religious instruction.[3]

However, the authorities of other States are not in agreement. A number of jurisdictions have held that reading the Bible in the public schools constitutes sectarian instruction, and violates the constitutional right to religious liberty, especially when the reading is combined with prayers or hymn singing.[4]

The use of the Bible as a *textbook* in the public schools has been held to be a violation of the constitutional provisions in question, even when used in a course, attendance at which was optional, but the use of texts founded upon the Bible do not violate the prohibitions.[5]

The reading of the Holy Bible without comment by a teacher of the public school system, in compliance with the Act of 1913 and for the purposes thereof, is not, in our opinion, the type of religious exercise or sectarian service which comes within the prohibitions of our constitution.

## IV.

IV. What effect, if any, does the Champaign case have on the Act of May 17, 1945, P. L. 629, referred to above, relating to *released* time for religious education?

---

[3] Com. ex rel. Wall v. Cooke, op. cit. supra; Spiller v. Woburn, 12 Allen (Mass.) 127 (1866); Nessle v. Hum, 1 Ohio N. P. 140 (1894); see also McCormick v. Burt, 95 Ill. 263 (1880); and see Church et al. v. Bullock et al., 104 Tex. 1, 109 S. W. 115 (1908).

[4] People ex rel. Ring et al. v. Board of Education of Dist. 24, 245 Ill. 334, 92 N. E. 251 (1910) (hymns included); Herold et al. v. Parish Board of School Directors et al., 136 La. 1034, 68 So. 116 (1915) (King James version); see also State ex rel. Weiss et al. v. District Board of School—Dist. No. 8 of the City of Edgerton, 76 Wis. 177, 44 N. W. 967 (1890); State ex rel. Freeman c. Scheve et al., op. cit. supra.

[5] State ex rel. Weiss et al. v. District Board of School Dist. No. 8 of the City of Edgerton, supra; State ex rel. Dearle et al. v. Frazier, 102 Wash. 369, 173 Pac. 35 (1918); Pfeiffer v. Board of Education of City of Detroit, op. cit. supra.

Section 1414 of the School Code, 24 PS §1421 provides:

"Every child having a legal residence in this Commonwealth, as herein provided, between the ages of eight and sixteen years, is required to attend a day school in which the common English branches provided for in this act are taught in the English language, and every parent, guardian, or other person, in this Commonwealth, having control or charge of any child or children, between the ages of eight and sixteen years, is required to send such child or children to a day school in which the common English branches are taught in the English language; and such child or children shall attend such school continuously through the entire term, during which the public elementary schools in their respective districts shall be in session: . . ."

Section 1605 of the School Code, 24 PS §1533 provides:

"The board of school directors of each school district shall fix the date of the beginning of the school term, and, unless otherwise determined by the board, the daily session of school shall open at nine ante meridian and close at four post meridian, with an intermission of one hour at noon, and an intermission of fifteen minutes in the forenoon and in the afternoon."

Section 1601 of the School Code, 24 PS §1531, prescribes a minimum school year term of 180 days.

An opinion by Deputy Attorney General J. W. Brown, dated May 7, 1924, 5 D. & C. 137, held that school directors might not excuse pupils during legal school hours for the purpose of attending denominational classes to receive religious instruction.

Subsequently, the legislature by the Act of May 17, 1945, P. L. 629, added section 1615 to the School Code. 24 PS §1563, as follows:

"Any board of school directors of any school district shall have power to enter into suitable arrangement with a religious group, or organization of responsible citizens resident in the school district, who are interested in organizing part-time weekday religious education for school pupils. In such cases the board of school directors shall have power to adopt such rules and regulations for the *release* from school sessions of those pupils whose parents, or surviving parent, or guardian, or other person having legal custody of such pupil, desires to have them attend a class to receive religious education, in accordance with their religious faith for not more than one hour a week, subject, however, to such conditions and the keeping of such records of attendance at such classes and other records for the inspection of school authorities as the board shall deem proper. No part of the cost and expense of such religious instruction shall be paid out of public school funds." ( Italics ours.)

This last statute provided for the so-called "released time".

It is to be kept in mind that section 1615 providing for so-called "released time" [6] is not mandatory but is an enabling provision under which any board of school directors may or may not adopt "released time" with latitude given to the board, to promulgate the details of any plan or program which it may establish thereunder.

---

[6] "Released time" religious education conducted off of school premises but during school hours has been adopted by schools in at least 34 States: Alabama, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, New Jersey, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Utah, Vermont, Virginia, West Virginia, and Wisconsin, and Alaska, and Hawaii. In New York State, this type of plan was upheld as constitutional by the court of appeals in a suit by an atheist (People ex rel. Lewis v. Graves, 245 N. Y. 185), and later embodied in the State's education law (Section 3210 (1)). See Vol. 34, American Bar Association Journal, page 483.

In his concurring opinion in the Champaign case, Mr. Justice Frankfurter states on page 231:

"We do not consider, as indeed we could not, school programs not before us which, though colloquially characterized as 'released time,' present situations differing in aspects that may well be constitutionally crucial. Different forms which 'released time' has taken during more than thirty years of growth include programs which, like that before us, could not withstand the test of the Constitution; *others may be found unexceptionable. We do not now attempt to weigh in the Constitutional scale every separate detail or various combination of factors which may establish a valid 'released time' program. . . .*" (Italics ours.)

Section 1615, added to the School Code by the Act of 1945, like all legislation, is presumed to be constitutional and the plan or program adopted by a school district under its provisions supplies the subject for constitutional test.

The Champaign case definitely ruled that "released time" for religious instruction of pupils during school hours in public school buildings offended the United States Constitution.

The difficulty in answering the question now being considered is that it does not present to us any specific program or plan adopted under the authorization given by section 1615.

Therefore, you are advised that released time plans should be permitted to continue unless (1) the plan adopted is substantially similar to that involved in the Champaign case; or (2) the plan conflicts with the principles expressed in our answers to questions I or II; or (3) you are advised that the plan is in violation of the State or Federal Constitution.

## V.

V. May school districts coöperate with local ministerial groups or others to the extent of closing the

regular sessions of school at an earlier hour on certain days of the week, in what is known as "dismissed time program" as distinguished from a released time program referred to in question no. IV above, in order to permit their pupils to obtain courses in religious instruction?

Section 1605 of the School Code, 24 PS §1533, provides that the daily session of the schools shall open at 9 a. m. and close at 4 p. m. We do not believe that the words "until otherwise determined by the board" are intended to permit a shortening of the school day such as would be required by the adoption of the plan of dismissed time.

Inasmuch as the School Code confers express authority upon the board of directors to adopt a plan of released time, and does not confer any similar authority to adopt a plan of dismissed time, it is our opinion that school directors are not permitted to adopt the latter.

You are accordingly advised that under the provisions of the School Code, school directors may not close regular sessions of schools at an earlier hour on certain days of the week in order to permit a dismissed time program.

## VI.

VI. What effect, if any, does the decision in the Champaign case have on the question of including a study of the development of religion or church history as a part of a general history course: the instruction to be given by a regularly certified teacher?

We find no provision in the school laws of this Commonwealth relating to the inclusion of such a course of study in the school curricula.

It is our opinion that so long as a course relates to the development of religion or the history of the church, as a part of a general history course, and is taught objectively and for the purpose of showing the effect of the same upon mankind, and not for the pur-

pose of propagating or examining into the merits of particular religious doctrines or beliefs, no prohibition is found in the Constitution or laws of the Commonwealth of Pennsylvania.

You are, therefore, advised that the public schools may include in their curricula a study of the development of religion or church history as a part of a general course conducted by a public school teacher.

Summarizing you are advised that:

I. Religious instruction may not be given to public school pupils in public school buildings during a time when the public schools are in regular session.

II. Public school buildings may not be used for religious instruction or religious services by any one, or by groups of individuals, including public school pupils, when the schools are not in session.

III. The reading of the Holy Bible without comment by a teacher of the public school system in compliance with the Act of May 20, 1913, P. L. 226, is not the type of religious exercise or sectarian service which comes within the prohibition of our Constitution.

IV. Released time program should be permitted to continue unless (1) the plan adopted is substantially similar to that involved in the Champaign case; or (2) the plan conflicts with the principles expressed in our answers to questions I or II; or (3) you are advised that the plan is in violation of the State or Federal Constitutions.

V. School directors may not close regular sessions at an earlier hour on certain days of the week in order to permit a dismissed time program.

VI. The public schools may include in their curricula a study of the development of religion or church history as a part of a general course conducted by a public school teacher, taught objectively and not for the purpose of propagating particular religious doctrines or beliefs.