No. 11,543.

PEOPLE EX REL. VOLLMAR v. STANLEY, ET AL.

Decided March 28, 1927. Rehearing denied May 9, 1927.

Action in mandamus. Judgment of dismissal.

*Reversed.*

1. SCHOOLS—*Compulsory Education.* The state may require children to be educated.

2.     *Studies.* Studies essential to good citizenship must be taught in public schools.

3. CONSTITUTIONAL LAW—*Schools.* The right of parents to have their children taught, where, when, how, what and by whom they may judge best, are among the liberties guaranteed by section one of the Fourteenth Amendment of the federal Constitution. This right, however, is subject to certain qualifications set forth in the instant case.

4.  SCHOOLS—*Studies.*  The teaching of what is immoral or inimical to the public welfare may be forbidden by the state even though taught as a moral and religious duty.

5.      *Studies.*  The determination of what studies are immoral or inimical to the public welfare is primarily for the school board and ultimately for the courts.

6.      *Rights of Parent—Studies.*  Although a school board has full power to prescribe studies, it cannot make the enjoyment of the parent's right to have his children educated in the public schools subject to the surrender of his right to direct the child's studies.

7.      *Statutes—Interpretation.*  The provision of the school laws that the board shall have control of instruction, should have a reasonable interpretation.

8.      *Studies.*  Children cannot be required to take every subject which the school board puts on the list, nor to take instruction not essential to good citizenship.

9.      *Constitutional Law—Bible Reading.*  Children cannot be required, against the will of their parents or guardians, to attend the reading of the Bible in public schools.

10.  CONSTITUTIONAL LAW—*Construction.*  Sections of the Colorado Bill of Rights concerning religious freedom are to be construed separately.

11.      *Schools—Bible Reading.*  Reading of the Bible in public schools held not to constitute a preference to a religious denomination contrary to article II, section 4 of the Constitution.

12.      *Religious Freedom.*  That clause in article II, section 4 of the Constitution reading, "nor shall any preference be given by law to any religious denomination or mode of worship" refers only to legislation for the benefit of a denomination or mode of worship.

13.      *Schools—Bible Reading.*  A school house is not a place of worship and neither children nor parents are supporting a religious sect or denomination by listening to the reading of the Bible, or by supporting a school where it is read.

14.      *Construction.*  Language used in the Constitution must be construed in the light of conditions prevailing at the time it was framed and in the practice, usage and understanding of that time.

15.  WORDS AND PHRASES—*"Place of Worship"* as used in article II, section 4 of the Constitution, means a place set apart for such use.

16.  CONSTITUTIONAL LAW—*Schools—Bible Reading.*  Reading of the Bible in public schools—attendance of children being optional—held not a denial of constitutional rights concerning religious opinions.

17. SCHOOLS—*Bible Reading.* Reading the Bible in a public school does not make it a school controlled by a sectarian denomination, nor is money expended in support of the school in aid of a sectarian purpose.

18. *Bible Reading.* Reading of the Bible in public schools does not create a religious test or qualification as a condition of admission to an educational institution of the state.

19. *Statutes—Construction.* "Educational institution of the state" means one of the so-called state institutions. Only the last sentence of the section (Const. art. IX, sec. 8) refers to public schools.

20. *Bible Reading.* Reading of the Bible in public schools without comment held not to be the teaching of sectarian tenets or doctrines.

21. *Religious Teaching.* The ultimate answer to the question of whether the Bible or any other book is sectarian or not must be by the courts.

22. *Bible Reading.* Proscription by a church cannot make that sectarian which is not actually so.

23. *Constitutional Law—Bible Reading.* Reading of the Bible in public schools—attendance thereon being optional—held not intolerant or religious persecution.

24. *Bible Reading.* Reading of the Bible in public schools where attendance thereon is optional, held not to deny children the free enjoyment of their religion, nor to discriminate against them because of their religion.

### On Rehearing.

25. PRACTICE AND PROCEDURE—*Appeal and Error.* On rehearing, the contention that a question determined by the court was not in the case, not considered, where it was argued and submitted without objection.

26. APPEAL AND ERROR—*Deficient Record.* Alleged statements of the trial court not shown in the record not considered on review.

27. *Judgment—Modification.* Where the principal controversy is resolved in favor of defendants in error, modification and affirmance of the judgment is justified on review.

28. COSTS—*On Review.* Where each party partially prevails on review, the costs are divided.

*Error to the District Court of Weld County, Hon. Robert G. Smith, Judge.*

Mr. WILLIAM H. SCOFIELD, Mr. HAROLD G. KING, Mr. HORACE N. HAWKINS, Mr. PHILIP HORNBEIN, Mr. JOHN J. MORRISSEY, Mr. CHARLES T. MAHONEY, Mr. GRANBY HILL-YER, for plaintiff in error.

Mr. RALPH L. DOUGHERTY, Mr. WALTER E. BLISS, for defendants in error.

Mr. RAYMOND M. HUDSON, Messrs. QUAINTANCE & QUAINTANCE, amici curiae.

*En Banc.*

MR. JUSTICE DENISON delivered the opinion of the court.

THE action was mandamus. Some of the court think there are certain technical objections to granting that writ in such a case as this, but since the parties have not urged them, we do not notice these objections except to say that this case is not to be regarded as an authority against them.

Mandamus was prayed, on the relation of Vollmar, to compel the respondents to "revoke their said rule requiring the reading of the Bible as a portion of the morning exercises in the schools in which petitioners' children are in attendance and prohibit such religious exercises in the public schools of said school district."

An alternative writ was issued which required the above action. To this writ the respondents demurred; the demurrer was sustained, the cause was dismissed and comes here on error.

The writ recites that the respondents, who constituted the board of education of school district 118, Weld county, had promulgated and enforced a rule which required, as a part of the morning exercises in each class room, the reading by the teacher of portions of King James' version of the Bible without comment; that relators' children withdrew during such reading, and thereupon the

respondents ruled that no pupil might leave the room during the reading.

The writ further states that the said version was a sectarian religious book and was proscribed by the Roman Catholic Church, to which relator and his children belong; that the relator and his children conscientiously believe in the doctrines and worship of the Roman Catholic Church which teaches that the King James translation is in part incorrect; is incomplete, and that the Scriptures ought not to be read indiscriminately nor without exposition by authorized teachers and that other reading thereof is harmful rather than beneficial. It is further alleged that such reading is religious service and sectarian instruction.

The claim is made that the action of the respondents is contrary to section 1 of the Fourteenth Amendment to the national Constitution, and to article II, section 4, and article IX, sections 7 and 8 of the Colorado Constitution. The pertinent part of the Fourteenth Amendment is as follows: "Nor shall any state deprive any person of life, liberty or property without due process of law. * * *"

The powers of the state, the children and their parents over their education may be briefly but accurately stated thus:

1. The state, for its own protection, may require children to be educated. This needs no citation.

2. Certain studies plainly essential to good citizenship must be taught. *Pierce v. Society of Sisters,* 268 U. S. 510, 534, 45 Supt. Ct. 571, 69 L. Ed. 1070, 39 A. L. R. 468; *Meyer v. Nebraska,* 262 U. S. 390, 43 Sup. Ct. 625, 67 L. Ed. 1042, 29 A. L. R. 1446. And, as a corollary, such studies may be required of every child.

3. Liberty is more than freedom from imprisonment. In re Morgan, 26 Colo. 415, 420, 58 Pac. 1071. The right to conduct a private school;* the right of parents

---

*At least a private school and its good will are property, protected by said Fourteenth Amendment.

to have their children taught where, when, how, what and by whom they may judge best, are among the liberties guaranteed by section 1 of the Fourteenth Amendment of the United States Constitution. *Pierce v. Society of Sisters, supra, Meyer v. Nebraska, supra; Hardwick v. School Trustees,* 54 Cal. App. 696, 205 Pac. 49, 50. *Spiller v. Woburn,* 12 Allen 127; *Farrington et al. v. Tokushinge,* (U. S.) 47 Sup. Ct. 406.†

4. But these rights are subject to the qualifications 1 and 2 above, and that teachers and places must be reputable, and the things taught not immoral or inimical to the public welfare. *Pierce v. Society of Sisters, supra.*

5. Conversely, the teaching of what is immoral or inimical to the public welfare may be forbidden by the state, even though taught as a moral and religious duty; e. g. polygamy. *Davis v. Beason,* 133 U. S. 333, 10 Sup. Ct. 299, 33 L. Ed. 637.

It necessarily follows that if parents can have their children taught what they please, they can refuse to have them taught what they think harmful, barring what must be taught; i. e., the essentials of good citizenship. What these are, the board of education of each district, primarily, and the courts ultimately, must decide. So whether any study is immoral or inimical to the public welfare the board primarily and the courts ultimately must decide. C. L. 8333. *Merrill v. Barr,* 73 Colo. 87, 213 Pac. 576; *Davis v. Beason* and *Meyer v. Nebraska, supra.*

Some of the court think that, under C. L. § 8333, and article IX, section 15 of the Colorado Constitution, which gives the school district board of education "control of instruction" therein, and under *Merrill v. Barr, supra,* the board has power to require attendance upon the study of any subject which they see fit to put on the course, and that the only remedy of parents is to put their children

---

† The Japanese parent has the right to direct the education of his own child without unreasonable restrictions, the Constitution protects him as well as those who speak another tongue.

in a private school; a majority of us, however, following, as we think, the above cited decisions of the Supreme Court of the United States,. hold that the right of the parents to select, within limits, what their children shall learn is one of the liberties guaranteed by the Fourteenth Amendment to the national Constitution, and of which, therefore, no state can deprive them.

The parent has a constitutional right to have his children educated in the public schools of the state. Colo. Const. art. IX, sec. 2. He also has a constitutional right, as we have shown, to direct, within limits, his children's studies. The school board, though with full power to prescribe the studies, cannot make the surrender of the second a condition of the enjoyment of the first. They cannot say to him, You have a constitutional right to deny your child the study of biology, and you have a constitutional right to have him taught in the public schools, but, if you are admitted to the latter, we shall deny you the former. This proposition has been more or less in doubt, but is finally settled in *Terral v. Burke Const. Co.*, 257 U. S. 529, 42 Sup. Ct. 188, 66 L. Ed. 352, 21 A. L. R. 186.

In the final analysis there is but one point on which the members of this court disagree. The minority assert, as they logically must to maintain their conclusion, that the parent has no right to deny his child the study of any subject which the school board may require (excepting, of course, such as are immoral or inimical to the public welfare). We concede that, if that is true, the board may require his child's attendance or deny him the school. We think, however, that the cases we have cited show that, within the limits we have stated, he has such right under the national Constitution. If that is true, then, since he has a right under the state Constitution to have his child attend the public schools, the requirement of study of a given subject or dismissal, in effect makes the surrender of his right under the national Constitution

a condition of his enjoyment of his rights under that of the state, which, as we have shown, cannot be done. The argument that he may send his child to a private school will not stand for several reasons, the chief of which is because he will thus be forced to surrender his rights in the public schools. The provision that the school board "shall have control of instruction" should have a reasonable interpretation. It does not seem reasonable that every child should be required to take every subject which the board puts on the list. These conclusions are strengthened in the present case because the children in question have no parochial school within the district and because a great majority of children, everywhere are, for one reason or another, dependent on the public schools for education.

It follows from the above that children cannot be compelled to take instruction not essential to good citizenship, and so, unless we hold the reading of King James' Bible to be such, we cannot say that the board had power peremptorily to require attendance upon it. Unquestionably much in the Bible is essential to good citizenship, but that much can be taught otherwise than from between two particular covers; i. e. from between two other covers. We cannot say, then, that the book itself is so essential to good citizenship that parents may not exclude it from the instruction of their children. The conclusion must be, therefore, that children cannot be required, against the will of their parents or guardians, to attend its reading. It follows that the relator was entitled to relief to the extent of revocation of the order of compulsory attendance of which he complains, and the demurrer to the alternative writ should have been overruled.

But there remains the question whether the reading of the Bible in the public schools must be prohibited altogether, which must be answered by another and differ-.

ent course of reasoning, with which the United States Constitution has nothing to do.

The pertinent parts of the Colorado Constitution which plaintiff in error relies on are as follows:

1.  The Bill of Rights: Article II, section 4. "Religious freedom. That the free exercise and enjoyment of religious profession and worship, without discrimination, shall forever hereafter be guaranteed; and no person shall be denied any civil or political right, privilege or capacity, on account of his opinions concerning religion; but the liberty of conscience hereby secured shall not be construed to dispense with oaths or affirmations, excuse acts of licentiousness or justify practices inconsistent with the good order, peace or safety of the state. No person shall be required to attend or support any ministry or place of worship, religious sect or denomination against his consent. Nor shall any preference be given by law to any religious denomination or mode of worship."

2.  Article IX, section 7. "Aid to private schools, churches, etc., forbidden. Neither the general assembly, nor any county, city, town, township, school district or other public corporation, shall ever make any appropriation, or pay from any public fund or moneys whatever, anything in aid of any church or sectarian society, or for any sectarian purpose, or to help support or sustain any school, academy, seminary, college, university or other literary or scientific institution, controlled by any church or sectarian denomination whatsoever; nor shall any grant or donation of land, money or other personal property ever be made by the state, or any such public corporation, to any church, or for any sectarian purpose."

3.  Article IX, section 8. "Religious test and race discrimination forbidden. Sectarian tenets. No religious test or qualification shall ever be required of any person as a condition of admission into any public educational institution of the state, either as a teacher or student;

and no teacher or student of any such institution shall ever be required to attend or participate in any religious service whatever. No sectarian tenets or doctrines shall ever be taught in the public schools nor shall any distinction or classification of pupils be made on account of race or color."

It is essential to accurate thinking to keep in mind that each clause of these sections must be construed separately, and that we are controlled by its meaning, not by expediency nor by our ideas of what it might or ought to be.

The first objection of plaintiff in error to the use of the Bible is that it constitutes a preference to a religious denomination or mode of worship contrary to the clause of article II, section 4, "Nor shall any preference be given by law to any religious denomination or mode of worship." It is scarcely necessary to say that this clause refers only to legislation for the benefit of a denomination or mode of worship and is aimed to prevent an established church.

The second objection is that petitioner's children are required to attend, and he to support a place of worship, religious sect or denomination against their consent, contrary to said section 4, "No person shall be required to attend or support any ministry or place of worship, religious sect or denomination against his consent." The answer is that a schoolhouse is not a place of worship and neither children nor parent are supporting a religious sect or denomination by listening to the reading of the Bible or by supporting a school where it is read. The meaning of this sentence must be found in the conditions of the times when it was framed,—in the practice, usage and understanding of that time. *Pfeiffer v. Board of Education,* 118 Mich. 560, 77 N. W. 250, 42 L. R. A. 536. The practice at that time was to open all public meetings on solemn occasions with prayer. The constitutional convention itself did so every day. We did so during the great war, Catholics, Jews, Protestants

together. When prayer is made in the Denver Auditorium, by Protestants, Roman Catholics and Jews, does it thus become a place of worship? Are the citizens of Denver by their taxes supporting a place of worship? Is any religious sect or denomination thereby supported? These questions answer themselves. A "place of worship" in this section means a place set apart for such use (*Billard v. Board of Education,* 69 Kan. 53, 76 Pac. 422, 66 L. R. A. 166, 105 Am. St. Rep. 148, 2 Ann. Cas. 521; *Hackett v. Brooksville School District,* 120 Ky. 608, 615, 87 S. W. 792, 69 L. R. A. 592, 117 Am. St. Rep. 599, 9 Ann. Cas. 36), and the plain meaning is that no one can be required to support or attend such a place. *Nichols v. School Directors,* 93 Ill. 61, 34 Am. Rep. 160. The situation before the convention was that in some states some churches were partly supported by taxation and we believe are still (*People v. Board of Education,* 245 Ill. 341, 92 N. E. 251, 29 L. R. A. [N. S.] 442, 19 Ann. Cas. 220), and that was the mischief at which this clause was aimed. *Church v. Bullock,* 104 Tex. 1, 7, 109 S. W. 115, 16 L. R. A. (N. S.) 860; 2 Scho. Const. L. & E. 477.

The third point is that the board's action is a denial to the children of rights on account of their opinions concerning religion, contrary to said section. On this point it is enough to say that if they are not required to attend the reading and are admitted to all classes which they wish, they will be denied no right. *Pfeiffer v. Board of Education,* 118 Mich. 560, 563, 77 N. W. 250, 42 L. R. A. 536; 2 Scho. Const. L. & E. 467, 468.

The fourth point is that reading the Bible in the public schools constitutes (1) Expenditure of public money in aid of a sectarian purpose, and (2) the use of public funds to sustain a school controlled by a sectarian denomination, contrary to article 9, section 7. The first is logically impossible if only those parts which are not sectarian are read without comment. No sectarian purpose can be served from between two covers what would not

serve if it read from between two other covers. It is not the Bible itself that is sectarian. If any part of it is so, it is a small part. It therefore cannot be said that Bible reading in the public schools causes the taxpayers to pay for aid to a sectarian purpose. *Donahoe v. Richards,* 38 Me. 379, 398, 399, 61 Am. Dec. 256.

As to a school "controlled by a sectarian denomination," a public school cannot be that. It is controlled by the public. Sectarian meant, to the members of the convention and to the electors who voted for and against the Constitution, "pertaining to some one of the various religious sects," and the purpose of said section 7 was to forestall public support of institutions controlled by such sects. It had no reference to public schools.

The fifth point is that it creates a religious test or qualification as a condition of admission to a public educational institution of the state, contrary to article IX, section 8.

An "educational institution of the state" means one of the so-called state institutions; e. g. University of Colorado, School of Mines or State Teachers' College. *People v. Higgins,* 67 Colo. 441, 443, 184 Pac. 365, is analogous. It is only the last sentence of this section that refers to public schools. Moreover the meaning of the clause as to the religious test is that any person of any religion or no religion may become a teacher or student, and it has nothing to do with what may be taught; and even if it had there would be no religious test for admission to the school merely because some of the pupils were taught what the religion of others forbade them to learn, but which the school did not require them to learn. See *Pfeiffer v. Board of Education,* 118 Mich. 560, 563, 77 N. W. 250, 42 L. R. A. 536; 2 Scho. Const. L. & E. 467, 468.

The sixth point is that the board requires the attendance of the children at a religious service contrary to article IX, section 8, but, as we have shown above, that part of said section does not refer to public schools, and

further, if the children are not required to attend, this point is out of the case.

The seventh point is that the reading is teaching sectarian tenets and doctrines, contrary to said section 8. That cannot be true unless those parts of it which teach some sectarian doctrines are read; and the record does not show that such is the case. The case of plaintiff in error is based on the claim that the whole King James Bible is sectarian, and whether that is true must be determined before we can decide this point.*

The weight of authority is heavily in the negative, and was so when our Constitution was enacted. Sectarian means pertaining to a sect, and, when put into the Constitution in 1875-6, was commonly used to describe things pertaining to the various sects of Christianity** and was not extended beyond the various religious sects. A sectarian doctrine or tenet, then, would be one peculiar to one or more of these sects, as, for example, the doctrine held by Baptists that immersion is necessary to valid baptism, a practice which many other sects tolerate but do not require. This was the view taken by the Supreme Court of the United States in the Girard College case, 2 How. 127, 11 L. Ed., 205, 235, and of the Supreme Court of Kentucky, *Hackett v. Brooksville School Dis-*

---

* It may be here noted that, in the last analysis, the objections of plaintiff in error are to the Bible merely as such, not (except as to those portions, if any, which are sectarian and which we discuss below), to its contents or substance. One cannot teach morality without teaching something out of that book. 2 Scho. Const. L. & E. 505. But relator does not object to the teaching of morality, nor does it appear that he objects to teaching it in the form of words in which it is taught in the Bible, e. g. the golden rule. His objection then is not to the matter (except as above) but to the covers between which it is found (or perhaps more accurately to other matters with which it is associated) because some Christians think the words themselves have divine authority.

** Prof. Schofield argues with some force that it means no more. 2 Scho. Const. Law, 496-500.

*trict,* 120 Ky. 608. So in Texas, *Church v. Bullock,* 104 Tex. 1, 109 S. W. 115, 16 L. R. A. (N. S.) 860. See also *Donahoe v. Richards,* 38 Me. 379, 398, 399, 61 Am. Dec. 256; *Board of Education v. Minor,* 23 O. St. 211, 13 Am. Rep. 233; *Spiller v. Woburn,* 12 Allen (Mass.) 127; *Pfeiffer v. Board of Education,* 118 Mich. 560; *Billard v. Board of Education,* 69 Kan. 53, 76 Pac. 422, 66 L. R. A. 166, 105 Am. St. Rep. 148, 2 Ann. Cas. 521.

The principal authority for plaintiffs in error on this point is *People v. Board of Education,* 245 Ill. 334, 92 N. E. 251, 29 L. R. A. (N. S.) 442, 19 Ann. Cas. 220. That decision was that the reading of the Bible in the public schools constituted ''sectarian instruction'' under the Illinois Constitution. The ground of this conclusion, though argued at length (pp. 347–349) was, in short, that whether it might be called sectarian or not, its use in the public schools necessarily resulted in sectarian instruction, and that the only way to prevent sectarian instruction was to exclude all religious instruction, including reading of the Bible, and plaintiffs in error urge this line of argument. We cannot agree to it. The members of the convention or the electors who ratified their action never thought of such a thing. See our discussion of the second objection above. As we there stated some of it is sectarian in the sense that it is relied on by this or that sect to prove its peculiar doctrines, but that does not make its reading the teaching of a sectarian tenet or doctrine. If all *religious* instruction were prohibited no history could be taught. Hume was an unbeliever and writes as such; Macaulay is accused of partiality to dissenters; Motley of injustice to Roman Catholics. Nearly all histories of New England and indeed of the United States are bound up with religion, religious inferences, implications and often prejudices. Modern New England histories take pains to correct some of these things and some people object to the corrections. Even religious toleration cannot be taught without teaching religion. Some strength is lent to the arguments in the

Illinois case by the fact that the reading there in question was part of a simple ceremony including singing, prayer and bowing the head, which furnished a sanction to what was read, but here the reading is alone and without comment, and as to that the Illinois case is obiter dictum. Further, if we are to take the argument of plaintiff that sectarian means more than the sects of religion and say that it means religious, as we are asked to do, we must push it to its logical limit, and say that believers are a sect, and that, in deference to atheists, no reference to God may be made (unless to deny Him, which we suppose would not be regarded as sectarian), and this would bar the singing of America and the Star Spangled Banner; and, if we should say that sectarian means religious, we would bar not only the greatest of our poets, including Shakespeare and Milton, whose most inspiring passages have a religious basis, but the greatest of our orators, including Webster, Clay and Lincoln. How then can the argument be sound that to avoid teaching what is sectarian we must avoid reading any book containing anything religious, that because some parts of the Bible are sectarian none can be read? Even in *State ex rel. Weiss v. Dist. Board,* 76 Wis. 177, 195; 44 N. W. 967, 974, 7 L. R. A. 330, 20 Am. St. Rep. 41, it is said that parts of the Bible are not sectarian. "There can be no valid objection to the use of such matter in the secular instruction of the pupils." Religious and sectarian are not synonymous. 2 Scho. Const. L. & E. 497. "The purpose of the constitutional restriction of 'sectarian' instruction was to provide against the promulgation or teaching of the distinctive doctrines, creeds or tenets of any particular christian or other religious sect." *Hackett v. Brooksville School District,* 120 Ky. 608.

It is claimed, however, that to distinguish the sectarian parts is impracticable and that we can make the section practicable only by excluding all religious matters from the schools. The basic fault of this claim is that it is

not we, but the Constitution that does the excluding, and we cannot exclude what it does not. Further, it is not easier but probably harder to determine what is or is not religious than what is or is not sectarian. What parts of Longfellow or Holmes are religious? Is the Hymn to the Night or the Chambered Nautilus or Lincoln's Second Inaugural religious or not?

The ultimate answer to the question "sectarian or not?", whether with reference to the Bible or any other book or doctrine, must be by the courts. *Hackett v. Brooksville School District, supra*; 2 Scho. L. & E. 473. We are now answering it with reference to the Bible. The Bible is a compilation of many books. Even an atheist could find nothing sectarian in the book of Esther. Is it not as practicable to say that that book is not sectarian as to say that the whole Bible is? Can we not separate the sectarian teachings of the Bible as practically as those of any other book? What right have we to say that the whole is when we know that part is not?

It is argued that, because some sects regard the whole Bible as sacred and inspired and others not, that it is therefore sectarian. Non sequitur. Sectarian or not cannot be determined of a book by how sects regard it. The decisive question is whether it teaches some doctrine peculiar to a sect. That part which does not is not sectarian. The eloquence of Amos and Isaiah and the wisdom of the parables is sectarian or not whether read from King James' version, the English Revised, the American Revised, the Douai or any of the many other translations, or from any other book.

It is said that King James' Bible is proscribed by Roman Catholic authority; but proscription cannot make that sectarian which is not actually so. *Hackett v. Brooksville School District*, 120 Ky. 608, 617, 618. If it could the atheists could proscribe the Star Spangled Banner, the Calvinists Whittier, and the fundamentalists half of modern science. Neither can the fact that it is authorized by a sect make it sectarian.

True, the address of the constitutional convention to the people stated that the Constitution provided "that no *religious* or sectarian dogmas" shall ever be taught in any of the schools under the patronage of the state, but "dogma" here has its ordinary meaning when used in connection with religion, which is "arbitrary dictum." Webster. It has no reference to the Bible or its teaching, but to arbitrary propositions of religion or theology.

*State ex rel. Dearle v. Frazier,* 102 Wash. 369, 173 Pac. 35, L. R. A. 1918 F, 1056, is cited, but the opinion there concedes that were their Constitution like ours, their arguments in favor of their decision would not stand. They distinguish the words "religious" and "sectarian." See pages 374, 375. Yet the plaintiff in error, though citing that case, would have us say that that "sectarian" must mean "religious." The Washington court says, page 375, that by the word "religious" more was intended than "sectarian" and that it was used in the light of other Constitutions. Who can doubt that ours was before the Washington convention?

Some corroboration of the theory that the Constitution was not intended to bar reading the Bible in the public schools is that the convention rejected a resolution to exclude it. This is not conclusive because it is possible that they thought that the word "sectarian" was enough to exclude the Bible, or, as Prof. Schofield suggests in behalf of the Illinois Constitution of 1870, perhaps they thought it would hinder or imperil the adoption of the Constitution by the people; but, in addition to the fact that at that time the word was not used with reference to the Bible and had been held by the Supreme Court of the United States and other courts not to cover the Bible, so that it is strange indeed that they should so consider it, we agree with the argument of the Supreme Court of Kentucky, 120 Ky. 618:

"If the legislature or the constitutional convention had intended that the Bible should be proscribed, they would simply have said so. The word 'Bible' is shorter and

better understood than the word 'Sectarian.' It is not conceivable that, if it had been intended to exclude the Bible from public schools, that purpose would have been obscured within a controversial word.''

Ours, however, is stronger than the Kentucky case for there was there a mere failure to mention the Bible, here there was an express refusal to mention it.

We conclude that the reading of the Bible without comment is not sectarian. When portions are read which are claimed to be sectarian the courts will consider them. 2 Scho. Const. L. & E. 476, note 481.

For the eighth point it is said that reading the Bible is intolerant and a form of religious persecution; but if those who don't like it can stay away and yet say to those who do like it "You shall not read it here," who is intolerant? Are those who stay away persecuted?

It is urged that to absent themselves for a religious reason "subjects the pupils to a religious stigma and places them at a disadvantage." We cannot agree to that. The shoe is on the other foot. We have known many boys to be ridiculed for complying with religious regulations, but never one for neglecting them or absenting himself from them. But such arguments are idle. They do not help us to know what the word "sectarian" meant in 1876 to the convention and to the voters.

It is claimed for a ninth objection that the rule in question denies to petitioners' children the free enjoyment of their religion and discriminates against them because of their religion; but, if they need not attend, how can that be so? They still exercise their religion as they please, and are neither deprived of anything nor are required to do anything on account thereof.

The tenth objection is that the rule violates the Fourteenth Amendment to the national Constitution. This point we have discussed.

It is argued that in yielding the point of compulsory attendance one necessarily concedes that the reading is sectarian. That is true only to this extent, that one may

thus concede for the purpose of the argument. But we do not concede it; we decide the point of compulsory attendance on the ground that parents, except as to certain essential matters, have the right to withdraw their children from what study they wish, regardless of its nature, religious, sectarian or otherwise.

The conclusion is that the Bible may be read without comment in the public schools and that children whose parents or guardians so desire may absent themselves from such reading. When comment or the reading of a given part is claimed to be teaching sectarian doctrines or tenet, the courts will consider that point, but it cannot be said that the whole Bible is so.

The judgment is reversed with directions to overrule the demurrer and proceed with the cause in accordance with this opinion.

Justices Adams and Whitford dissent from the allowance of optional attendance upon the reading of the Bible.

MR. JUSTICE ADAMS, concurring in part and dissenting in part.

I concur in that part of the majority opinion which holds that the Bible may be read in the public schools. I dissent from the part which allows optional attendance while it is being read.

A brief statement of our points of difference may serve to clarify our respective views. We are in accord that the Bible is not sectarian, and that it may be read in the public schools without violating either the federal or state Constitution; that no discrimination should be made in favor of or against the version or translation of the Bible as such, adopted or used by the followers of any particular religious faith, and that all are free to worship God according to the dictates of their own conscience, or not worship Him at all; that much in the Bible is essential to good citizenship, and that the reading of

the Bible in the schoolroom does not make it a place of worship.

The essential point of difference between the members of this court relates to compulsory attendance. The majority opinion is that such compulsory attendance would violate the liberties guaranteed by that part of the Fourteenth Amendment to the national Constitution which forbids any state to deprive any person of life, liberty or property without due process of law. The minority believe that this constitutional provision would not be violated by such compulsory attendance. In particular, the majority believe that the Supreme Court of the United States supports their contention, while, on the other hand, the minority think that such decisions have the opposite effect. The court is also unanimous that under section 15, article 9 of the state Constitution, the public school directors are invested with control of instruction in the public schools of their respective districts, but that the parents also have certain fundamental rights concerning the education of their children. Our chief difficulty has been in ascertaining the dividing line between the rights of the parents and the board in respect to enforced school attendance, growing out of the objections to the Bible reading.

The Colorado Constitution provides: Art. IX, sec. 15. School districts—Board of education. "The general assembly shall, by law, provide for organization of school districts of convenient size, in each of which shall be established a board of education, to consist of three or more directors, to be elected by the qualified electors of the district. Said directors shall have control of instruction in the public schools of their respective districts."

Art. IX, sec. 16. Text books in public schools. "Neither the general assembly nor the state board of education shall have power to prescribe text books to be used in the public schools."

C. L. 1921, § 8333, provides: "Powers of school board. Every school board, unless otherwise especially provided

by law, shall have power, and it shall be their duty: * * * Second. * * * to fix the course of study, the exercises and the kind of text books to be used; * * * Eleventh. To exclude from school and school libraries, all books, tracts, papers and other publications of an immoral or pernicious tendency. * * * ''

Section 8333 is only declaratory of the constitutional powers of the school board, to which the legislature could not add, nor from which it could not subtract. This court, in speaking of the power of the board to fix the course of study and the kind of text books to be used, said in *Merrill v. Barr,* 73 Colo. 87, 89, 213 Pac. 576: ''This power is unqualified and unlimited and the board may order to be taught whatever subjects it sees fit whether the same are taught in high schools, colleges or elsewhere.'' The same justice writing the opinion in the instant case says, to which we all agree: ''* * * whether any study is immoral or inimical to the public welfare the board primarily and the courts ultimately must decide.'' The school board and this court have decided that the reading of the Bible without comment is not immoral or inimical to the public welfare. The only further limitation to be read into the powers of the board is that its course of conduct shall not violate any right guaranteed to anyone under the federal or state Constitutions. Does it do so? Each side claims that it would unless their own particular contentions prevail, quoting, in a large measure, the same constitutional provisions and authorities in support of their respective arguments. Since the majority opinion so ably demonstrates the constitutional right of the school board to order the reading of the Bible in the school, little more need be said as to this feature, except as it bears upon the subject of compulsory attendance. However, since the majority of the justices believe that certain decisions of the Supreme Court of the United States justify the belief that compulsory attendance would violate the Four-

teenth Amendment to the federal Constitution, and I think otherwise, I shall first attempt to briefly analyze some of those decisions. *Meyer v. Nebraska,* 262 U. S. 390, 43 Sup. Ct. 625, 67 L. Ed. 1042, 29 A. L. R. 1446, is the leading case relied upon, and is followed by *Bartels v. Iowa,* 262 U. S. 404; *Pierce v. Society of Sisters,* 268 U. S. 510, 45 Sup. Ct. 571, 60 L. Ed. 1070, 39 A. L. R. 468, and *Farrington v. Tokushige,* (U. S.) 47 Sup. Ct. 406.

In one sense it must be said that neither side to this suit are entitled to rely upon any of the above decisions as being decisive of this case because different facts were involved and the questions that bother us here were expressly said by the court in the Meyer case not to be within that controversy. At page 402 of the Meyer decision it is said: "The power of the state to compel attendance at some school and to make reasonable regulations for all schools, including a requirement that they shall give instruction in English, is not questioned. Nor has challenge been made of the state's power to prescribe a curriculum for institutions which it supports. Those matters are not within the present controversy. Our concern is with the prohibition approved by the Supreme Court."

The "prohibition" referred to above was the attempted proscription by the Nebraska legislature of the teaching of the German language within the state borders. The legislation was approved by the Nebraska Supreme Court and reversed in our highest court. A similar absence of the perplexing questions confronting us occurs in the other United States Supreme Court cases mentioned. But in another sense they would seem to strongly support respondents' and not relator's position because relator seeks to prohibit and deprive respondents and a large number of school children from the privilege and enjoyment of an incomparable book and the instruction that it contains. Thus if the Fourteenth Amendment is

involved at all, it would appear to justify a conclusion that to sustain plaintiffs in error would be to deprive defendants in error of their property without due process of law, and that the only theory upon which plaintiffs in error could invoke the due process clause would be on the untenable ground that they are not permitted to take away a valuable right that belongs to others in common with themselves. If it be true that it is valuable, and this cannot be successfully denied, it is no answer then to say that you may get something equally as good in another place—i. e. "between two other covers"—or at another time, unless such pleas be allowed as justification for the unlawful withholding of any man's property. Nor is it suggested, nor can you get something else just as good as the Bible, except in quotations therefrom. The court has well shown that it permeates all literature, and it may be assumed that such quotations would provoke the same objections that are interposed here; so the substitution of covers would accomplish nothing. It is the contents that are involved.

Again as to the Meyer case, as to relator, there it was a simple problem in subtraction, whereas, here it is one in addition. In other words, there it was the attempted taking away from the people the right to acquire a knowledge of a useful modern foreign language, and the right of the instructor to teach it, but in this case the trial court upholds the addition to the sum of useful knowledge. From relator's standpoint, it is hard to see how the gift of a book which the courts say is good, and which is good without a court decree, can be said to *deprive* a person of life, liberty or property without due process under the Fourteenth Amendment. To make plainer my understanding of the broad purpose and high concept of the Meyer decision, I advert to these words of Mr. Justice McReynolds (262 U. S. 390, 400, 43 Sup. Ct. 625): "The American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted. The Or-

dinance of 1787 declares: 'Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.' Corresponding to the right of control, it is the natural duty of the parent to give his children education suitable to their station in life; and nearly all the states, including Nebraska, enforce this obligation by compulsory laws.''

It is to be plainly inferred from the above that the schoolhouse is the place that the learned Justice had in mind when he wrote the above. It was the schoolhouse that was under fire—there, a private or parochial school —here, a public school. Ostensibly, the schoolhouse was referred to by the court as the place for the inculcation of the virtues spoken of as being necessary to good government, even to the extent of ''enforcing this obligation by compulsory laws,'' however much the training should be supplemented in the home or elsewhere. The only answer that could be offered is that of sectarianism, but the court has rightly held that the Bible is not sectarian and that no discrimination shall be allowed. Previous to the Meyer case, it was held in a number of cases that the ordinance of 1787 is superseded by state constitutions, except so far as continued by state constitutions and statutes. This was one of the grounds of rejection in *People v. Board of Education,* 245 Ill. 334, 92 N. E. 251, 29 L. R. A. (N. S.) 442, 19 Ann. Cas. 220, but is of little importance here because the principle quoted from the ordinance of 1787 is reflected in our state laws. Neither side make any serious contention that it is not; they differ only in their application of it to the facts.

I need not dwell at length upon the decisions of the United States Supreme Court following the Meyer case because that is the one upon which succeeding adjudications are based; it is symbolic of the rest, and the opinion there and in the cases that follow it were written by the same Justice, with a continuity of thought and pur-

pose pervading them all, the encouragement of learning and the teaching of religion, morality and knowledge, not their suppression. In the latest decision, *Farrington v. Tokushige, supra,* the court says: ''The general doctrine touching rights guaranteed by the Fourteenth Amendment to owners, parents and children in respect of attendance upon schools has been announced in recent opinions. *Meyer v. Nebraska,* 262 U. S. 390; *Bartels v. Iowa,* Id. 404; *Pierce v. Society of Sisters,* 268 U. S. 510.'' *Meyer v. Nebraska* and *Bartels v. Iowa* were decided at the same time and the reasoning in the former was adopted in the latter. *Pierce v. Society of Sisters* held invalid an act of the Oregon legislature that sought the destruction of private schools and the compulsory attendance of children at public schools. Our state Constitution is quite to the contrary; it expressly provides for enforced attendance '' * * * unless educated by other means.'' Colo. Const. art. IX, sec. 11. And as shown above, art. IX, secs. 15 and 16, denominated the school board, not a private party, nor the legislature, nor the court, to prescribe a curriculum. I have spoken of the limitation on this right. *Farrington v. Tokushige, supra,* held invalid legislation of the territory of Hawaii attempting to inhibit the teaching of the Japanese language. The opinion says: ''The Japanese parent has the right to direct the education of his own child without unreasonable restrictions; the Constitution protects him as well as those who speak another tongue.'' There is no dispute here about this right. The sentence must be taken in connection with the excerpt quoted above from the Meyer case concerning compulsory attendance and the right of the state to prescribe a curriculum for institutions which it supports. In *Farrington v. Tokushige, supra,* the territorial act as a whole was under consideration and the court further said: ''No effort has been made to discuss the validity of the several provisions.'' Like the Nebraska, Iowa, and Oregon cases, the Hawaiian decision involved the life of private or parochial schools.

Their unquestionable right to existence is settled, undisputed, and not involved here. The difference is that in those cases relators wanted a useful knowledge in the schools, while here they want it out. If this is not obtainable, they ask the privilege of going and coming to and from school during its sessions. It is doubtful if anyone would suggest such laxity in private or parochial schools; the chief difference in relation to public schools is its bearing upon the subject of taxation, but the court has disposed of this point adversely to relator's contentions. The baneful effects of such a departure in the conduct of the public school is shown by relator himself in his petition and in the alternative writ, quoting from the letter of the school board to the parents:

"  *   *   * Certain pupils have been violating the rules of the school by walking out of the rooms during the opening exercises. This practice is purely uncalled for; it is tending to break down the morale and discipline of the school; it is causing hard feelings to exist between the pupils. All of this, of course, is not for the best interests of the school.   *   *   *"

The Supreme Court of the United States in the decisions quoted has recognized the salutory provisions of compulsory attendance laws; Colorado and other progressive states have enacted them, and have provided truant officers and other means to make them effective. "The natural rights of a parent to the custody and control of his infant child are subordinate to the power of the state, and may be restricted and regulated by municipal laws. One of the most important natural duties of the parent is his obligation to educate his child, and this duty he owes not to the child only, but to the commonwealth." State v. Bailey, 157 Ind. 324, 329, 61 N. E. 730, 731, (59 L. R. A. 435).

This expresses the wellnigh unanimous trend of modern decisions. But it would be unfair to relator to assume that he contends against the general principles of compulsory attendance. In other words, his children

would need no compulsion if the reading of the Bible were eliminated, or if excused from attendance during that particular time. His point is that to enforce such attendance at such time would infringe his religious liberties and his freedom of conscience, and therefore attendance should be excused. This brings us back to the Fourteenth Amendment that has been so fully considered by all of the members of the court, and discussed above, the majority of the court believing that such liberty would be infringed, and the minority that it would not.

It is impossible to reconcile the contrariety of opinions in the adjudicated cases in the several states, or among their judges, or in the briefs before us. This might remind one of the language of Lord Bacon: ''When atheists and profane persons do hear of so many discordant and contrary opinions in religion, it doth avert them from the church, and maketh them to 'sit down in the chair of the scorners.' '' The apostles of the same creed do not always agree among themselves. There are Protestants that differ in their theological interpretations of both versions. One generation may take issue with a generation that has gone before, but the book survives. The venerable and eminent Cardinal H. E. Francis Aidan Gasquet of England, said by many Catholics to be the ' profoundest scholar of the Hierarchy, assisted by a commission appointed by Pope Pius X, is engaged in a revision of the Vulgate, now in progress in Rome, if not already completed. It is not being done necessarily for the purpose of producing a new Catholic Bible, but to the admirable end of a better understanding of the book among themselves, and to determine as accurately as possible the text of St. Jerome's Latin translation. Concerning this, it has been said: ''The mountain castles of Spain have loaned to them their ancient parchments; the monastaries of the Alps, the Archives of the British Isles, have likewise been drawn upon.'' Other instances might be multiplied referring to other churches.

It may be said that this is out of the record, both as to Catholics and Protestants, but any discussion of a book so universal must of necessity carry both court and counsel somewhat aside from the compass of a narrow record in court. It is at least as germane as a church edict, honestly quoted by counsel for relator in support of their contentions. The learned writer of the majority opinion rightly says that proscription cannot make that sectarian which is not actually so, and that the Bible antedates creeds and sects. Creeds may differ; scholars may not agree, but we do not need to possess the technique of a theologian, nor to espouse any creed in order to appraise the worth of the instruction in good government the book contains. It belongs to the masses and with all genuine respect to Doctors of Divinity, my point is that since the mental food value of the book has stood the test of age-long demonstrations, and it is not sectarian, the diagnosis is therefore complete and further proceedings are within the exclusive province of the school board. Compulsory attendance in lessons in good government is not enforced belief in any theological doctrine. None such is, or should be, taught in the public schools; no examination is required; no paper marked and no freedom infringed. For other annotations on extent of legislative power with respect to attendance and curriculum, and without attempting to classify the conflicting cases, see extended notes in 5 A. L. R. 866; 20 A. L. R. 1351; 31 A. L. R. 1125; 39 A. L. R. 477, and 16 L. R. A. (N. S.) 860. See also *Wilkerson v. City of Rome,* 152 Ga. 762, 110 S. E. 895, 20 A. L. R. 1334; *Evans v. Selma etc., Dist.,* 193 Cal. 54, 222 Pac. 801, 31 A. L. R. 1121.

It is unnecessary to go into the subject of our Bill of Rights or state Constitution, as the Justice writing the opinion has shown that it has not been violated. I think he has done so without the necessity of permitting optional attendance. It may be that the Supreme Court of the United States will ultimately adopt the view of the majority of the justices in the instant case, but until they

do, the question is debatable with us as to the Fourteenth Amendment to the federal Constitution. I am reluctant to say that the Bible is good, and in the same breath declare that if you do not agree with us, you may exercise an opinion to the contrary. It promotes disorder and confusion. I believe that the entire spirit of American state papers and the decisions of the Supreme Court of the United States as well as our own Constitution tend to support the reasonable exercise of the power of the school board, and that their action is not unreasonable. Liberty implies the absence of arbitrary restraint—not immunity from reasonable regulations. *Chicago, B. & Q. R. Co. v. McGuire,* 219 U. S. 549, 31 Sup. Ct. 259, 55 L. Ed. 328. A conscientious objector to sectarian instruction is entitled to be heard, and has been heard, resulting in his failure to single out any such instruction, his objection going to the book as a whole. But it is hard to see where a "conscientious objector" to lessons in good government gets his standing under the Fourteenth Amendment or elsewhere.

It is to be remembered that the school directors are as fully constitutional officers as are the members of the court. It would seem that when we have said that the Bible is not sectarian, and is not inimical to the welfare of the child, but on the contrary contains lessons in good citizenship, it is tantamount to saying that its public reading is constitutional, whether attendance be required or not. Having said this, our jurisdiction ceases on the threshold of the schoolhouse, without assuming or burdening ourselves with any pedagogical tasks, or usurping the constitutional prerogatives of the educational authorities of the state.

While I feel reluctantly compelled to disagree in part with the majority opinion, I may still be permitted to express my admiration for its careful and painstaking thought, the clarity with which it is expressed, and the conscientious regard for the rights of all parties that it

displays. I think the judgment of the trial court should be affirmed without modification.

Mr. Justice Whitford authorizes me to say that he agrees with my views as herein expressed.

## On Rehearing.

MR. JUSTICE DENISON.

The defendant in error moves for rehearing on what amounts substantially to the ground that the question of compulsory attendance was not in the case. That point was, however, urged on us in argument with no objection by defendant in error, and a majority of the court is of the opinion that it was in the case, raised by the facts stated in the alternative writ. If plaintiff did not want that question considered he should have left it out of his writ, and if defendants did not want it considered they should have made the record show that they conceded the point. The statements in the motion for rehearing, purporting to be made by the trial judge, as to what happened at the trial, not shown in the record here, are, of course, not properly before us and we cannot consider them. We all agree, however, that the principal controversy—i. e. the question as to reading the Bible in the public schools,—was resolved in favor of defendants in error, and that we are therefore justified in doing what we frequently do in such cases, modifying the judgment and affirming it as modified; but that, since plaintiff in error has partially prevailed, he cannot fairly be charged with all the costs here.

The rehearing is denied. The judgment of the district court is modified to direct the board to revoke their order of compulsory attendance on the reading of the Bible, and as modified is affirmed.

Each party will pay one-half of the costs in this court.

MR. JUSTICE ADAMS.

The petition for rehearing filed by defendants in error asserts that the question of compulsory attendance was not involved in the case, and that the trial judge did not pass upon it. Such was the impression that Mr. Justice Whitford and I had of the matter in the beginning, but as the majority of the court felt that it was necessarily involved and dwelt upon it, we gave our views upon the subject in our dissenting opinion, to which we adhere.

The deep respect that all of us maintain for the decisions of the Supreme Court of the United States, caused each member of this court to earnestly seek guidance from its opinions. The majority believe that their views are sanctioned by pronouncements of our highest court; the minority do not, and have endeavored to express their conception of the spirit of such decisions. If we had been able to agree upon our interpretations in this regard, our decision in this case would have been unanimous.

Mr. Justice Whitford authorizes me to say that he joins with me in the above statement.